**James Y. NISHIMURA, et al.,**
**Plaintiffs,**

v.

**Charles F. DOLAN, et al., Defendants.**

**Civ. A. No. 83–0085.**

United States District Court,
E.D. New York.

Oct. 19, 1984.

Jay E. Ricks, P.C., David J. Saylor, Harry T. Jones, Jr., Hogan & Hartson, Washington, D.C., for plaintiffs James Y. Nishimura, Communication Systems Corp., Huntington TV Cable Corp., Home Entertainment Productions, Inc.

Sullivan & Cromwell, New York City, for Cablevision and individual defendants; Michael A. Cooper, Yvonne S. Quinn, James W. Dabney, Steven H. Reisberg, New York City, Joseph F. Carlino, P.C., Mineola, N.Y., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, a partnership including P.C., New York City, for defendant Meadowlands Basketball Associates; Moses Silverman, Michael A. Lampert, New York City, of counsel.

Arthur H. Christy, David S. Machlowitz, Christy & Viener, New York City, for defendant Nassau Sports.

BARTELS, District Judge.

This case involves a dispute between two cable television companies in Huntington, Long Island, in competition for subscribers to sports programs covering the games of the Yankees, the Mets, the Islanders, and the Nets. Huntington is a town of 54,000 homes, presenting an unusual situation in the cable television systems industry in that two "overbuilt" television systems have franchises and are competing head-to-head for subscribers to their respective systems. Plaintiffs, owning one of the systems, invoke the antitrust laws in challenging the conduct of its competitor-defendant in obtaining exclusive rights to cablecast the games of these four well-known New York professional sports teams. In doing so, the complaint joins the teams as well as the competing cable system operator in violating the antitrust laws. Specifically, the plaintiffs seek treble damages, under § 4 of the Clayton Act, 15 U.S.C. § 15, for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, allegedly arising from various conspiracies to restrain and monopolize competition for the provision of cable television services in Huntington, New York.

The parties having completed extensive "first wave" discovery, defendants presently move for partial summary judgment, Fed.R.Civ.P. 56(b), dismissing the defendant sports teams from the action on the counts of the complaint predicated upon alleged conspiracies to deny plaintiffs access to "essential" cable television sports programming.

At this stage of the litigation, the court is called upon to decide, in essence, whether the teams belong in this lawsuit. The defendants, in making this motion, argue that there are no genuine issues of material fact to be tried upon this issue and that the uncontradicted evidence shows no team participation in the allegedly anticompetitive conspiracies. In contrast, the plaintiffs vigorously argue that triable issues of material fact do exist and, alternatively, that further discovery is required in order to adequately support their position. Fed.R.Civ.P. 56(f).

## I. *The Parties*

The individual plaintiff, James Y. Nishimura, is the alter-ego of the three corporate plaintiffs: Communication Systems Corp. ("CSC"), Huntington TV Cable Corp. ("HTVC"), and Home Entertainment Productions, Inc. ("HEP"). He and members of his family own 100% of CSC's outstand-

ing stock, while CSC in turn is the sole parent company of HTVC and HEP. Nishimura is also president and a director of all three corporate plaintiffs. Since 1967 plaintiff HTVC has had a franchise in Huntington, New York, for the operation of a cable television system. In addition to offering its subscribers "basic" cable television service [1] HTVC offers several packages or tiers of "premium" programming services for an additional monthly fee. Plaintiff HEP was organized by Nishimura to purchase premium programming services from third parties for resale to HTVC and its subscribers.

Defendant Charles F. Dolan can similarly be described as the alter-ego of the ten defendant corporations and partnerships listed in the margin.[2] For the sake of convenience and except where otherwise noted, these ownership-affiliated and commonly managed entities will be collectively referred to as "Cablevision." Its businesses include the operation of numerous cable television systems in the New York metropolitan area and the original production of television programming for cable television distribution to its own systems and non-Cablevision systems. The three remaining individual defendants—Lawrence Meli, Robert J. Sullivan, and John Tatta—are officers of one or more of the Cablevision entities.

Two of those entities play the most important roles in this scenario. Defendant Sports Channel Associates is a partnership (of which defendant Dolan is one of three general partners) engaged in the original production of professional and amateur sporting-events programming. Since March, 1979, SportsChannel Associates has produced, marketed and distributed a premium cable television service, known as "SportsChannel," throughout the metropolitan area, which consists of a variety of television programs on a year-round basis featuring principally sports events participated in by New York area teams. SportsChannel Associates sells "SportsChannel" to cable system operators not controlled by Cablevision as well as to those owned by Cablevision. An important exception and the cause of this action, as will be discussed *infra,* is the refusal by SportsChannel Associates to sell "SportsChannel" to plaintiff HTVC.

The second Cablevision entity of immediate importance is Cablevision of Huntington which, since December, 1981, has operated a cable television system in direct competition with HTVC in Huntington. Cablevision of Huntington offers "SportsChannel" to its subscribers as a premium service, having acquired the rights to do so from its sibling entity, defendant SportsChannel Associates.

The remaining group of defendants of greatest significance for purposes of this motion consists of four New York area professional sports teams [3] (collectively referred to as "the teams"): Nassau Sports Ltd., which stages professional ice hockey games with its team, the New York Islanders ("Islanders"); Meadowlands Basketball Associates, which stages professional basketball games with its team, the New Jersey Nets, formerly known as the New York Nets ("Nets"); Doubleday Sports, Inc., and New York Yankees Partnership, both of

---

1. "All cable systems offer basic service packages available to all subscribers for one monthly fee. These programs include all local broadcast television shows, satellite-delivered cable network programming and community oriented, locally originated cablecasts ... Subscribers can pay an extra charge over the basic monthly rate to receive 'pay cable' programming channels consisting of feature films, sports events, cultural and family programming." 1 Ferris, Lloyd, Casey, Cable Television Law ¶ 5.02 (1983).

2. Cable Vision Systems Development Company, Communications Management Corporation, Ca-

blevision Systems Holding Company, Atlantic Cable Television Service Corporation, Cablevision Systems Huntington Corporation, Cablevision of Huntington, Cablevision Program Services Company, Cablevision Systems Corporation, Cablevision Consolidations Company and SportsChannel Associates.

3. The complaint originally named a fifth team, Meadowlanders, Inc. ("Devils") as a defendant. Subsequent to the filing of this motion, plaintiffs voluntarily dismissed the Devils without prejudice.

which stage professional baseball games with their respective teams, the New York Mets and the New York Yankees ("Mets" and "Yankees"). At least since 1979, each of the teams has had an exclusive contractual relationship with Cablevision permitting a certain number of their games to be cablecast on "SportsChannel."

## II. *The Complaint*

Plaintiffs' seventeen-count complaint is prolific in its charges and seeks relief under sections 1 and 2 of the Sherman Act (Counts I to XI) and also sets forth pendent state antitrust (Count XII) and common law tort claims (Counts XIII to XVII). Defendants' summary judgment motion addresses Counts I through IX and Count XII; the remaining counts neither involve the teams nor allege unlawful conduct in connection with the denial of access to sports programming. The claims contained in the subject counts will be collectively referred to as the "sports claims."

The complaint contains a number of predicate allegations which are incorporated by reference into each of the sports claims. Among the most important of these, all found in paragraph 39 of the complaint, are that the "ability to cablecast to subscribers games of the ... professional New York teams is essential to successfully compete in the cable television industry in Huntington"; that the games staged by each defendant team constitute "a distinct product for which there is strong demand among cable television subscribers in Huntington"; that these games have no adequate programming substitutes; and that "but for" Cablevision's exclusive control of the sublicensing of rights to cablecast the teams' games, Cablevision of Huntington would not have overbuilt HTVC's system.

Counts I through IV of the complaint charge the defendants with violating §§ 1 and 2 of the Sherman Act by conspiring to restrain and monopolize horizontal competition in the cable television trade in Huntington. The alleged means employed by the defendants were the teams' grant of exclusive production and distribution rights to Cablevision followed by Cablevision's refusal to sublicense the teams' games to HTVC so that its own cable system could cablecast the games exclusively. Counts V through VIII charge various horizontal and vertical conspiracies among the defendants in violation of § 1 of the Sherman Act, the purpose of these conspiracies being the elimination of competition among the teams, and among the teams and Cablevision, in the production and sale of cablecast rights to the teams' games. In furtherance of such conspiracies defendants have allegedly agreed to limit the number of games available for cablecasting; have participated in a tying arrangement comparable to block booking; have agreed to produce and distribute the games through a single entity (Cablevision); and have refused to deal with plaintiffs and others similarly situated. Finally, Count IX alleges that, in violation of §§ 1 and 2, Cablevision conspired with the teams to misuse its monopoly power in its noncompetitive franchise areas within the New York metropolitan area to obtain exclusive production and sublicensing rights and especially to secure exclusive cablecasting rights in Huntington in order to establish a monopoly there.

## III. *Background*

### A. *Cable Television Franchises in Huntington*

In late 1967, HTVC and the Town of Huntington entered into a non-exclusive franchise agreement for the construction and operation of a cable television system. When it commenced operating in 1971, HTVC was capable of serving eighty percent of Huntington's 54,000 homes, the remainder being in areas where utility lines were underground and thus more costly to connect than where above-ground utility poles were available. Until 1981, HTVC had a *de facto* monopoly in the provision of cable television to residents in Huntington.

The demise of HTVC's monopoly can be traced back to 1969, when the Town of Huntington awarded a co-franchise to Inter-County Television of Suffolk, Inc. ("Inter-County"). However, the latter took no steps to construct a cable television sys-

tem, and its franchise remained fallow until Cablevision acquired Inter-County in 1973. Then Inter-County unsuccessfully sought confirmation of its franchise from the New York State Commission on Cable Television ("Cable Commission"), see N.Y.Exec.Law § 821 (McKinney 1982). Nonetheless, prompted by concern over HTVC's failure to connect homes not accessible by above-ground utility poles, in 1976 the Town of Huntington executed a new franchise agreement with Inter-County requiring it to serve homes in those areas and permitting it to "overbuild"[4] HTVC's existing system. In March, 1978, over the vigorous opposition of HTVC, the Cable Commission approved the new franchise agreement. After two years of construction, during and even after which time HTVC unsuccessfully brought six separate proceedings before the Cable Commission and in the state court to block construction and invalidate the franchise, Cablevision of Huntington began operating in December, 1981. Since that time HTVC and Cablevision of Huntington have been in direct competition for most of Huntington's existing and new subscribers.

## B. *Exclusive Contracts Between Cablevision and the Teams*

Since 1975 Cablevision has entered into a number of contracts with the teams granting it certain exclusive rights in connection with the production and distribution of sports programming for cablecasting the teams' games in the metropolitan area. It is important to note that the contracts covered the entire metropolitan area and not Huntington alone. Because these contracts are of the utmost importance the court believes that the essential features of the contracts shared by all the teams, as well as a summary description of the individual contracts on a team-by-team and chronological basis, should be set forth pointing out those terms governing duration and exclusivity.

**4.** "Overbuild" refers to a situation in which a second cable television operator wires the same streets and competes head-to-head for subscrib-

## 1. *Essential Features of the Contracts*

The basic scheme of the several contracts, exceptions to which will be noted on a team-by-team basis, *infra,* was the grant to Cablevision of the exclusive license to produce the game programming and to sublicense cablecasting rights to operators of cable television systems within the teams' "home territory." Such systems would include those owned by Cablevision and those owned by others. Since 1979, when SportsChannel Associates created "SportsChannel," all of the teams' cablecast games have been sublicensed to cable operators as part of the "SportsChannel" premium cable television service. The teams contracts almost invariably gave Cablevision *the right* to sublicense all cable system operators within a given territory (generally the New York metropolitan area and in all cases inclusive of Huntington) but did not *obligate* Cablevision to sublicense all potential sublicensees. The language whereby Cablevision retained sublicensing discretion varied greatly from contract to contract. Some of the contracts specifically provided that Cablevision had no obligation to sublicense non-Cablevision owned systems (such as HTVC) which were competing in the same geographic area against Cablevision systems (such as Cablevision of Huntington). The teams, of course, in granting exclusive sublicensing rights to Cablevision, gave up all rights themselves to deal independently with third-party cable system operators seeking to cablecast the teams' games.

Since the inception of "SportsChannel" in 1979, all of the contracts have provided that Cablevision be solely responsible for the production and origination of the sporting events carried on "SportsChannel" and the costs thereof. For the home games of two of the teams—the Nets and the Islanders—Cablevision has generally leased production facilities from an independent sports-programming producer. For the home games of the Mets and Yankees,

ers with the operator which first served the area.

Cablevision has leased the production facilities of two local broadcast stations which have separate agreements with those teams for the broadcasting of a certain number of the teams' games.[5] The Mets and Yankees agreements have provided that the teams would use their best efforts to make the broadcasters' facilities available for Cablevision's use. For those away games of the teams cablecast by Cablevision on "SportsChannel," the agreements generally provided that the teams would procure a "split feed"[6] for Cablevision, at the latter's cost, from the producer at the away arena.

The contracts entered into prior to 1982 generally required Cablevision to make fixed payments to the teams, either on a per-season or a per-game basis, which did not depend on the number of Cablevision's sublicensees or ultimate viewers. Since 1982, the contracts between Cablevision and the Islanders, Mets, and Yankees all provide for payment by Cablevision based on a percentage of revenues derived from "SportsChannel." Thus, under the latter agreements those teams' licensing income is presumably related to the number of "SportsChannel" subscribers since sublicensing revenues are based, at least in part, on the number of subscribers that purchase "SportsChannel" from the sublicensee.

### 2. The Individual Agreements

*The Islanders.* In 1975 the Islanders and Cablevision entered into their first agreement granting Cablevision[7] exclusive cablecast rights to Islanders games for five hockey seasons (1975–76 to 1979–80). The agreement also designated the Islanders as Cablevision's agent for the sale of cable television rights to the Islanders games to cable systems not owned by Cablevision, but all such sales were subject to Cablevision's approval. This agency provision led to a dispute between the parties, Cablevision brought suit, discussed *infra,* and in 1978 the agreement was judicially voided. As part of a settlement of the suit a new agreement was entered into that year granting Cablevision an exclusive license to produce and distribute Islanders games for cable television transmission for five hockey seasons (1978–79 to 1982–83). In 1982 the Islanders and Cablevision entered into a new agreement, presently in effect, granting Cablevision exclusive production and distribution rights for thirty seasons.[8]

*The Nets.* Until 1967 the Nets and Islanders were commonly owned and shared a home arena on Long Island, New York. Thus, in 1975 the Nets first entered into an agreement with Cablevision identical to the 1975 Islanders agreement, and it met the same fate in 1978 as a result of the same litigation. In August, 1978, Cablevision and the Nets (now owned by defendant Meadowlands Basketball Associates and located in New Jersey) entered into a new agreement which differed, however, from the 1978 Islanders agreements in several

---

5. The Mets and Yankees have agreements with WOR TV and WPIX TV respectively, granting those stations rights to broadcast some of those teams' games. Those games are also available to HTVC subscribers as part of the basic service. The teams' agreements with Cablevision grant rights to those games not broadcast by WOR or WPIX.

6. Typically, the production facilities necessary to provide video feed of games at most stadiums are controlled by a local broadcaster with rights to the local team's games. A visiting broadcaster or cablecaster, with rights to the visiting team's games, generally obtains a "split" of the video feed from the local broadcaster and pays him an amount reflecting a fair share of his production and origination costs.

7. This initial agreement was between the Islanders and Long Island Cable Communications Development Company ("LICCDC"), a predecessor of SportsChannel.

8. *See* Appendix to Defendants' Cross-Motion for Summary Judgment ("Def.App.") Exh. Y (Nets/Islanders Agreement with LICCDC of 1975); Appendix of Exhibits to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.App.") Exh. 4 (Nets/Islanders Agreement with HEP of 1976); *Long Island Cable Communications Co. v. Nassau Sports,* No. 13533/76 (N.Y.Sup.Ct.1977) (*"LICCDC"*); Pl.App.Exh. 5 (*LICCDC* trial transcript); Def.App. Exh. U (*LICCDC* decision); Pl. App.Exh. 13 (Islanders/Cablevision Agreements of 1978 and 1982).

important respects. The outstanding variation was that the Nets retained production rights and responsibilities and only granted Cablevision the right to distribute Nets games in areas where Cablevision owned a cable television system franchise. In other words, under the 1978 agreement the Nets produced the games and distributed them directly to cable system operators. The Nets became disenchanted with this arrangement by early 1979 and later that year entered into a new agreement with Cablevision amending their 1979 agreement for the 1979–80 through 1983–84 basketball seasons. The new agreement, which permitted Cablevision to offer Nets games as part of "SportsChannel," granted Cablevision exclusive production and distribution rights throughout the Nets' home territory rather than only in those areas where Cablevision had its own franchise. The record does not reveal any more recent agreements between Cablevision and the Nets.[9]

*The Mets.* The Mets first contracted with Cablevision in 1979, granting it exclusive rights to produce and distribute cablecasts of Mets games for the 1979 and 1980 baseball seasons as part of "SportsChannel." Pursuant to an option provision, Cablevision renewed the agreement for the 1981 season. After the 1979 season the Mets were acquired by its present owner, defendant Doubleday Sports, Inc., and in 1980 the Mets entered into an agency agreement with the Islanders appointing the latter as the Mets' exclusive agent for the sale of rights to cablecast Mets games. Pursuant to this agreement the Islanders negotiated with Cablevision on behalf of the Mets and Islanders beginning in 1980, culminating in the 1982 Islanders agreement, mentioned above, and an agreement simultaneously entered into between the Mets and Cablevision which virtually duplicated the thirty-year 1982 Islanders agreement. The 1982 Mets agreement remains in effect.[10]

*The Yankees.* The Yankees and Cablevision entered into their first agreement in April, 1979, granting Cablevision exclusive rights to produce and distribute Yankees games as part of "SportsChannel" for the 1979 and 1980 baseball seasons. In March, 1981, an almost identical agreement was reached with Cablevision covering the 1981 season only. In May, 1982, the Yankees and Cablevision entered into a fifteen-year (1982 to 1996 seasons) agreement, currently in effect, once again granting Cablevision exclusive production and distribution rights.[11]

## C. *Plaintiffs' Efforts to Obtain Sports Programming from the Teams and Cablevision*

An important issue raised by defendants' motion involves the extent to which plaintiffs sought sports programming rights—and the nature of the rights sought—which they claim in this lawsuit were unlawfully withheld in furtherance of anticompetitive conspiracies.

Plaintiffs' efforts to obtain rights to cablecast the teams' games fall into three categories. The plaintiffs' first efforts began in September, 1975, when Nishimura wrote to Roy Boe, then principal owner of the Islanders and Nets, proposing the carriage of his teams' games as part of a sports programming package to be offered to HTVC subscribers as a separate, premium cable television service. Approximately one month later, however, those teams entered into their first contracts with Cablevision for the 1975–76 through 1979–80 seasons. As noted above, these contracts designated the Islanders and the Nets as agents for the sale of cable exhibition rights for their games to third-party operators, subject to Cablevision's prior approval. Pursuant to their agency power the

---

9. *See* Pl.App.Exh. 12 (Nets/Cablevision Agreements of August, 1978 and August, 1979).

10. *See* Pl.App.Exh. 11 (Mets/Cablevision Agreements of 1979 and 1982); Appendix of Exhibits to Memorandum Supporting Plaintiffs' Motion for Additional Discovery Exh. A (Nassau Sports/Mets Agency Agreement of 1980).

11. *See* Pl.App.Exh. 10 (Yankees/Cablevision Agreements of 1979, 1981 and 1982).

teams negotiated with several cable system operators, including Nishimura, resulting in a series of offers by Nishimura and three other operators, all of which were rejected by Cablevision. Nevertheless, the Nets and Islanders entered into agreements with all four operators in September, 1976. The agreements with plaintiff HEP (which would "resell" the programming to HTVC) purported to grant it exclusive rights to cablecast in Huntington all of the teams' home games for the 1976–77 through 1979–80 seasons.[12]

Cablevision promptly brought suit in the state court to void the four sets of agreements and ultimately prevailed when the court ruled that Cablevision had not unreasonably rejected the operators' offers and thus those teams had breached their 1975 agreement with Cablevision by entering into the 1976 contracts without Cablevision's prior approval. In June, 1978, the court issued a final judgment awarding Cablevision over $4 million in damages against those teams and terminating the 1976 agreement. The teams filed a notice of appeal, but later withdrew their appeal simultaneously with the execution of the 1978 agreements with Cablevision as part of an overall settlement. As a result of this litigation the 1976 agreement between the two teams and HEP was never implemented.

The second effort by the plaintiffs to obtain sports programming occurred in September, 1979, when Seth Morrison, HTVC's program director, wrote to the principal owners of the Yankees and Mets[13] requesting an opportunity to discuss the availability of their 1980 home games for cablecasting by HTVC. The letters indicated that HTVC had been unable to cablecast the games because of the teams' exclusive contracts with Cablevision. According to Morrison, he followed

up the letter with telephone calls to representatives of both teams and further explained that HTVC was interested in obtaining necessary production rights or, alternatively, rights to a "split feed" produced by another. The teams declined to consider HTVC's proposal, citing their exclusive contracts with Cablevision.[14]

Plaintiffs' third effort to secure programming rights occurred in early 1982, which was after Cablevision of Huntington commenced operating with a cable television "menu" that included "SportsChannel." At this time plaintiffs were solely interested in acquiring "SportsChannel" for HTVC in Huntington from Cablevision and made no attempt to purchase any rights directly from the teams. Rather, plaintiffs adopted a strategy of direct negotiation with Cablevision and informal contacts with the teams hoping to enlist their support in pressuring Cablevision to sell "SportsChannel" to plaintiffs. This strategy failed. After months of inconsequential communications with Cablevision, in June, 1982, Nishimura made demand upon Cablevision for it to make available "SportsChannel" to HTVC in Huntington on a comparable basis with other licensees. In a series of letter exchanges, copies of which Nishimura sent to the teams, Cablevision cited HTVC's signal-theft security problems[15] as its reason for not entertaining plaintiffs' request for "SportsChannel." Nishimura labelled this concern baseless and a "red herring" and pressed his demand for "SportsChannel" to no avail. Throughout this period Nishimura contacted, either personally or through others, various representatives of the Yankees, Mets, and Islanders seeking their assistance in acquiring "SportsChannel" for HTVC in Huntington. Citing their teams' exclusive contracts with Cablevision, the

---

12. *See* Pl.App.Exh. 2 (Nets/Islanders Agreement with LICCDC of 1975); Pl.App.Exh. 4 (Nets/Islanders Agreement with HEP of 1976). At this time HTVC was the only cable system operating in Huntington.

13. The record contains a copy of Morrison's letter to·the Yankees.

14. *See* Affidavit of Seth Morrison ("Morrison Aff."), dated May 14, 1984, Paragraphs 5–6.

15. Signal-theft security problems concern the ability of subscribers to receive cable programming without authorization and without paying.

teams stated that plaintiffs would have to deal with Cablevision in order to acquire any cablecasting rights to the teams' games.[16] Plaintiffs then commenced the instant suit in January, 1983.

Defendants' motion essentially seeks dismissal of all claims alleging conspiracies involving the teams to deny plaintiffs access to sports programming, fundamentally on the grounds that plaintiffs never sought the same rights granted to the Cablevision defendants, that plaintiffs lack standing to sue the teams, and that plaintiffs' injuries were not caused by the teams' actions. On the other hand, plaintiffs' position is that they did seek rights "akin to" those granted to Cablevision, that adequate demand was made, and that the alleged injury was caused by the teams' actions.

Specifically, defendants request dismissal of (i) Counts V through IX (which principally allege horizontal conspiracies among the teams) in their entirety, and (ii) Counts I through IV and XII insofar as they challenge the legality of the exclusive contracts or claims that the teams conspired with Cablevision to deny plaintiffs production rights or "SportsChannel" programming. Should defendants prevail, the teams no longer will be parties to this litigation and plaintiffs' antitrust claims against Cablevision involving sports programming will be considerably narrowed.

### IV. *Discussion*

A party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show that there is no genuine issue as to any material fact and that [it is] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Also, "[i]t is well established that 'the burden [is] on the moving party to demonstrate the absence of any material factual issue genuinely in dispute ...' " *Hayden Publishing Co., Inc. v. Cox Broadcasting*

*Corp.*, 730 F.2d 64, 68 (2d Cir.1984) (quoting *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In determining whether a genuine issue of material fact exists, the non-moving party must be given the benefit of all reasonable doubts. *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 n. 6 (2d Cir.1980), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). The function of the district court on a motion for summary judgment is not to resolve conflicting claims, but to "determine whether there are issues of fact to be tried.... Stated another way, the key is issue-finding, not issue-resolution." *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir.1982).

■ It follows that in complex antitrust litigation, summary proceedings are disfavored and sparingly utilized when, as is often the case, resolution turns on issues of motive and intent. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir.1977); *see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2732.1 (1983). That is not to say that summary judgment is never appropriate in antitrust litigation, particularly where motive and intent are not involved, *see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968), *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d at 13 n. 6, but it appears clear that motive and intent are not involved where standing is at issue,

---

16. *See* Pl.App.Exh. 7 (Plaintiffs' Answers to Defendants' Interrogatories Set Forth in Pretrial Order No. 1, Paragraph 8); Morrison Aff.; Affidavit of W. Gerard Asher, dated June 13, 1984; Affidavit of James Y. Nishimura dated June 14, 1984; Deposition of James Y. Nishimura at 502– 05, 517–18; Deposition of John O. Pickett at 240–44; Def.App.Exh. J & K (Letters between HTVC and Cablevision); Deposition of Eugene J. McHale, dated September 27, 1983 at 113–14; Affidavit of Stuart B. Freeman, dated January 12, 1984.

494

*Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 189 (2d Cir.1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971), and that "standing is a question of law for the court to determine." *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498 (9th Cir.1977). *Cf. Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (complaint dismissed for failure sufficiently to allege antitrust injury).

■ To have standing to sue there must be an injury resulting from the violation of the statute. Consequently, standing is an important limitation on the right to maintain a private damage action under § 4 of the Clayton Act, 15 U.S.C. § 15. The statute provides:

... any person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... (Emphasis added.)

Although the language may be read to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation, the courts have been "virtually unanimous in concluding that Congress did not intend antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to" such a violation. *Hawaii v. Standard Oil Company of California*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972); *see Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. at 534, 103 S.Ct. at 907; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2547–48, 73 L.Ed.2d 149 (1982). The courts have instead looked to common law principles which limit the availability of damage recoveries. As the Supreme Court has recently noted, "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause', and the struggle of federal judges to articulate a precise test to determine whether a party injured

by an antitrust violation may recover treble damages." *Associated General Contractors*, 459 U.S. at 535–36, 103 S.Ct. at 907–08. *See Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 295 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). The plaintiffs must demonstrate "a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage." *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d at 187; 2 P. Areeda & D. Turner, Antitrust Law, § 334 at 163 (there must be "a significant causal connection between the defendant's violation and the plaintiff's injury"). If the plaintiffs, at this stage of the litigation, cannot demonstrate a sufficient link between their injury and the defendants' alleged conduct, standing will be denied. As to plaintiffs' claims made under the New York State antitrust laws, N.Y.Gen. Bus.Law § 340 (McKinney's 1968), the New York State courts have adopted the same standing constraints as imposed by the federal courts under § 4 of the Clayton Act. *Neeld v. National Hockey League*, 439 F.Supp. 446, 454–55 (W.D.N.Y.1977); *Lerner Stores Corp. v. Parklane Hosiery Co.*, 86 Misc.2d 215, 218, 381 N.Y.S.2d 968 (Sup. Ct.), *aff'd on other grounds*, 54 A.D.2d 1072, 388 N.Y.S.2d 760 (4th Dep't 1976).

A. *Plaintiffs' Standing*

■ With this principle in mind the court considers the issues presented by this motion. The sole injury for which plaintiffs seek redress under § 4 of the Clayton Act is HTVC's loss, starting in December, 1981, of potential and existing cable television subscribers to its direct competitor Cablevision of Huntington. There appears to be little doubt that the direct cause of this injury is Cablevision's refusal, and not the teams' refusal, to grant plaintiffs the right to carry the defendant teams' games on "SportsChannel" while granting such a right to plaintiffs' competitor. The actions of the teams, in granting Cablevision the exclusive right to produce and distribute

their games and thereby making the games available to plaintiffs only through Cablevision, are at most an indirect cause of the injury. That is to say, plaintiffs' loss of subscribers can only be traced to the teams through Cablevision's independent exercise of the exclusive rights granted it by the teams.

To illustrate, if plaintiffs' immediate competitor, Cablevision of Huntington, did not offer its subscribers "SportsChannel", plaintiffs, under their own theory, would suffer no competitive injury upon which to base a claim, regardless of their inability to acquire cablecasting rights. Similarly, if the teams granted the same exclusive production and distribution rights to Cablevision but Cablevision did not have a cable system franchise in Huntington, HTVC would suffer no competitive loss due to the teams' actions if Cablevision refused to grant it a "SportsChannel" sublicense. In other words, only when Cablevision is competing with HTVC and exercises its rights of refusal does the alleged loss result to HTVC.

The unmistakable fact is that the various contracts between the teams and Cablevision expressly give the latter sole discretion to sublicense or not to sublicense the teams' games to third-party cable system operators. The contracts unambiguously demonstrate that the teams contractually relinquished to Cablevision all control to distribute their games. *See Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d at 13 n. 6 (summary judgment appropriate where the issue of causal relationship between alleged violation and injury turned on documentary evidence).

In addition to its indirectness, the chain of causation between plaintiffs' harm and the teams' alleged wrongdoing otherwise contains no precisely defined links which are sufficient to support standing. *Associated General Contractors*, 459 U.S. at 540,

103 S.Ct. at 910. As the Court of Appeals for the Second Circuit stated:

> ... there are inherent limitations in the substantive protection afforded by the antitrust laws: they exclude claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of [defendant's action]. *Cf. Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 583–85 (3d Cir.1979).

*Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d at 14. For instance, to the extent that plaintiffs claim that in the absence of the exclusive contracts with Cablevision [17] the plaintiffs could have purchased cablecasting rights directly from the teams, the requisite causal relationship nevertheless rests on speculation that (a) the teams would have produced the programming of the games themselves for distribution, (b) plaintiffs would have reached a licensing agreement with the teams not only individually but collectively as a package, and (c) Huntington subscribers would then have chosen to subscribe to plaintiffs' cable service. It is appropriate to cite again *Reading Industries, Inc. v. Kennett Copper Corp.*, 631 F.2d at 13–14, where the court said, "[t]o find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy concerning the relative effect of an alleged conspiracy in the market for refined copper on the price of copper scrap, where countless other market variables could have intervened to affect those pricing decisions." Added to such variables is the undisputed fact that plaintiffs never were interested in acquiring or offered to acquire exclusive production and distribution rights on a metropolitan-wide basis, the product offered by the teams. At all

**17.** In reference to the exclusivity clauses in the teams' contracts, *see United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, (E.D.Pa. 1960), *aff'd*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (per curiam), where the record showed that one product was necessarily tied to

another as a single package without violation of the antitrust laws. This principle was affirmed in *Jefferson Parish Hospital District No. 2 v. Hyde*, — U.S. —, 104 S.Ct. 1551, 1565, 80 L.Ed.2d 2 (1984).

times plaintiffs' interest was in acquiring rights to cablecast the teams' games on HTVC in Huntington only, an opportunity not offered by the teams but by a third party, Cablevision, in the form of "SportsChannel." The plaintiffs' claims that they could have purchased cablecasting rights from some other third-party "middleman" who *might* have contracted with the teams for production and distribution rights had not the teams granted those rights exclusively to Cablevision are even more speculative. By introducing this hypothetical middleman into this hypothetical scenario, the plaintiffs' link between the teams' alleged wrongdoing and the plaintiffs' injury is based on sheer speculation.[18]

To support their contention of standing, plaintiffs heavily rely upon *Blue Shield of Virginia v. McCready, supra,* and *Crimpers Promotions, Inc. v. Home Box Office, supra.* This reliance is misplaced. In *McCready* the plaintiff was a health subscriber who sought and was refused reimbursement for the costs of treatment by her psychologist. As a practice the defendant insurer reimbursed subscribers for the costs of psychotherapeutic services provided by psychiatrists but not by psychologists. The psychologists were the obvious target of the anticompetitive practice. McCready sued the insurer and a statewide organization of psychiatrists, charging that the insurer's failure to reimburse was in furtherance of a conspiracy to restrain competition in the psychotherapy market. The standing analysis employed by the Court in *McCready* focused on two distinct types of limitation which the courts, "drawing on statutory policy," 457 U.S. at 473, 102 S.Ct. at 2545, have used to restrict the availability of the § 4 remedy, one of which relates to duplicative recovery

and the other to remoteness. Only the latter is relevant to this case.

That limitation relates to the court's denial of standing where a plaintiff's injury is too remote from an antitrust violation. 457 U.S. at 476–84, 102 S.Ct. at 2547–51. In applying the "elusive" concept of remoteness, the Court wrote:

> we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and, (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

457 U.S. at 478, 102 S.Ct. at 2548.

Concerning "remoteness" and causation, the Court asserted that plaintiff alleged a sufficient "physical and economic nexus" between the alleged violation and injury; denying reimbursement was the very means by which defendants sought to achieve the alleged illegal ends and McCready's injury was precisely the type of loss that the claimed violations would be likely to cause. *Id.* at 479, 102 S.Ct. at 2549. It concluded that McCready's alleged injury was of a type that Congress sought to redress in providing a § 4 remedy because it was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. at 2551.

In *McCready* there was no question whether the defendants' alleged conduct had *in fact* caused the plaintiff's alleged injury. The denial of reimbursement was both the means by which defendants sought to achieve the alleged illegal ends and the very injury for which plaintiff

---

**18.** In passing upon constitutional standing issues, which the court recognizes are somewhat different from antitrust standing, the Supreme Court has also required a substantial causal nexus between injury and conduct. In *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), it denied standing to parents of public school students who challenged the IRS's grant of tax exemptions to racially discriminatory schools, writing:

> The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable decision... Is the line of causation between illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

sought redress. Here, the alleged wrong-doing by the teams—granting exclusive rights to Cablevision—did not, as previously discussed, cause plaintiffs to lose subscribers to Cablevision of Huntington. Such action is not inextricably intertwined with the alleged injury sustained by the plaintiffs.

*Crimpers* is equally unavailing to plaintiffs' position. The plaintiff in that case organized a cable television trade show to facilitate contacts between producers of cable television programming and local cable television systems. The complaint alleged that defendants, two companies, Home Box Office, Inc. and Showtime Entertainment Corporation, allegedly dominant in the business of purchasing and assembling programming from producers and selling it to the cable systems, conspired to cause a boycott of plaintiff's trade show. Applying *McCready* standing analysis to those alleged facts, Judge Friendly, writing for the Second Circuit, held that the plaintiff, although not a direct competitor of the defendants, had standing under § 4 to assert its antitrust claims.

*Crimpers* is distinguishable from the present case on the same ground as *McCready*. The trade show allegedly was a failure due to the defendants' actions, which were anticompetitive, so that the plaintiff's injury in *Crimpers* had the same direct causal nexus with the alleged antitrust violation as was present in *McCready*. As the court stated in *Crimpers*, "[t]he alleged violations were defendants' conspiring to interpose barriers against direct dealings between the producers and the stations and attempting to monopolize the business of furnishing programs. Crimpers got in the way and defendants allegedly made it suffer for trying to do so." 724 F.2d at 294.

**B.** *Cablevision's Refusal to Sublicense "SportsChannel" to HTVC and the Teams' Liability*

■ The only other respect in which the teams are accused of violating the antitrust laws is their alleged complicity in Cablevi-sion's refusal in 1982 to grant a "SportsChannel" license to HTVC. The allegation reads that the teams "refused to enable" plaintiffs to receive "SportsChannel" from Cablevision. The short answer to this claim is simply that the teams had no legal right to affect Cablevision's sublicensing decision one way or the other. Cablevision did not need the teams' consent "to effectuate [its] determination not to deal" with HTVC. *Reisner v. General Motors Corp.*, 671 F.2d 91, 99 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

The mere fact that plaintiffs allege a conspiracy, the specific intent of which was to harm them, does not save their complaint against the teams. As the Court stated in *Associated General Contractors*, 459 U.S. at 537, 103 S.Ct. at 908:

... an allegation of improper motive, although it may support a plaintiff's damages claims under § 4, is not a panacea that will enable any complaint to withstand a motion to dismiss. Indeed, in *McCready*, we specifically held: "The availability of the § 4 remedy to some person who claims its benefits is not a question of the specific intent of the conspirators." 457 U.S., at 479, 102 S.Ct. at 2549. [Footnotes omitted.]

Plaintiffs' standing in this case turns on the relationship between the teams' actions and plaintiffs' alleged injury, not on the particular motive plaintiffs attribute to the teams. To repeat, the plaintiffs have not established a nexus adequate to support standing. In addition, there is no evidence that the teams attempted to influence Cablevision to defeat plaintiffs' efforts in 1982 to obtain "SportsChannel." To the contrary, the evidence shows that it was the plaintiffs who actively solicited the teams' assistance in acquiring "SportsChannel" and that in response to the *plaintiffs'* solicitation various team officials made inquiry of Cablevision. Such conduct hardly raises an inference of causation or conspiracy.

Nor is it enough for plaintiffs to point to similar exclusivity agreements by the

teams with Cablevision. Such evidence indicates "nothing more than parallel business behavior" which, "standing alone, is insufficient to give rise to an inference of an agreement among the defendants" nor to an inference of causative conduct by the defendants. *Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F.Supp. 960, 965 (N.D.Ill.1982).

### C. *Failure to Demand Rights from the Teams*

 Assuming, *arguendo*, that plaintiffs can establish a causal link between the teams' conduct and the alleged loss of subscribers, plaintiffs' claims against the teams based on the exclusive contracts with Cablevision must fail for an additional reason. The teams stand accused, essentially, of refusing to grant plaintiffs cablecast rights in furtherance of a conspiracy with Cablevision to monopolize cable television trade in Huntington. Paragraph 40 of the complaint alleges, as a predicate to all the sports claims, that "[p]laintiffs have ... requested several defendant Teams to grant plaintiff cablecast rights *on the same basis* that Teams have granted such rights to [Cablevision]. Defendant Teams, without business justification and in furtherance of the conspirators' aims, have refused to deal with plaintiffs." (Emphasis added.) The record, however, clearly demonstrates that plaintiffs did not seek rights "on the same basis" that the teams granted Cablevision. In his affidavit in opposition to defendants' motion, plaintiff Nishimura acknowledges that plaintiffs were never interested in, much less sought, rights to produce and distribute the teams' games on an exclusive, metropolitan-wide basis. Yet that is exactly the basis upon which the teams granted rights to Cablevision. Plaintiffs were solely interested in obtaining rights to cablecast the teams' games over HTVC in Huntington. In reality, plaintiffs wished to purchase a product entirely different from the one the teams were offering. Absent a demand to purchase that which is the subject of an alleged refusal to deal, there can be no recovery under the antitrust laws. *Lawlor v.*

*National Screen Service Corp.*, 270 F.2d 146, 154 (3d Cir.1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960); *Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533, 536 (2d Cir.), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); *J.J. Theatres, Inc. v. Twentieth Century-Fox Film Corp.*, 212 F.2d 840, 845 (2d Cir.1954); *Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561, 568 (7th Cir.1951), *cert. denied*, 342 U.S. 909, 72 S.Ct. 302, 96 L.Ed. 680 (1952); *Gordon v. New York Stock Exchange, Inc.*, 366 F.Supp. 1261, 1263 (S.D.N.Y.1973), *aff'd*, 498 F.2d 1303 (2d Cir.1974), *aff'd*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 168, 92 S.Ct. 1965, 1969, 32 L.Ed.2d 627 (1972).

There is another flaw in plaintiffs' demands. They were not only inadequate but were not timely. The record shows that at most plaintiffs' demands for cablecast rights from the teams consist of two letters and a few telephone calls from Seth Morrison, who then served as Program Director for HTVC in 1980. In his affidavit Morrison states that he knew at the time of his contacts that both teams had already granted exclusive rights to Cablevision. No demands which led to refusals were ever made upon the Nets and Islanders. In his deposition, Nishimura unequivocally states that he was seeking rights only "for defendant teams' programs carried on SportsChannel as SportsChannel provides to other cable companies.... [T]he rights we were seeking prior to the commencement of the lawsuit was with SportsChannel." Depos. of James Y. Nishimura, at 502–05, 517–18. Other than in 1976 when the Islanders and Nets did grant cablecast rights to plaintiffs (although the contracts were never implemented due to litigation), there is no evidence that plaintiffs ever demanded cablecast rights from the teams at any of the numerous times when the teams were contractually free to consider offers from parties other than Cablevision. In his affidavit, however, filed after the motion for summary judgment was institut-

ed, Nishimura states that he periodically attempted to attain rights to provide games of the individual teams but that from his experience with the teams and lack of information, he was "foreclosed" and "frozen out" from that possibility, and that it would have been futile to make further direct communications with the teams.[19] While this may be true, after the contracts were signed, there is no evidence that such was true before the contracts were executed.[20] In sum, the undisputed evidence demonstrates that plaintiffs failed to demand at any time the same rights which are the subject of the claimed refusal to deal by the teams and, therefore, the teams cannot be held liable under the antitrust laws.

### D. *Plaintiffs' Requests for Additional Discovery*

█ Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, plaintiffs have submitted a dense, 50-page affidavit containing 46 separate discovery requests for additional documents and depositions which they believe must be granted in order to present material issues of fact essential to justify their opposition to defendants' motion. Many of the requests are specific, many are blunderbuss, and many seek discovery previously refused by the court. All of the requests share one element in common: immateriality to the dispositive issues in this case. Throughout this litigation plaintiffs' demand for discovery has been all-encompassing. The discovery to date has been far-reaching and voluminous, consisting of thousands of pages of documents and over two thousand transcript pages of depositions. The numerous contracts between the teams and Cablevision have been disclosed virtually in full text despite defendants' legitimate concerns over the dissemination of sensitive and con-

fidential business information. They now seek additional evidence, such as depositions of the officers of Cablevision, drafts of the original contracts, preliminary negotiations with respect to the key provisions of the contracts, and evidence of conversations with representatives of the various teams before the execution of the contracts. None of the discovery sought, which in some instances is repetitious, cumulative and peripheral, is relevant as far as the teams are concerned. As stated by Mr. Justice Marshall in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. at 298, 88 S.Ct. at 1597, in affirming a summary judgment:

> But in this case petitioner was attempting, in effect, to obtain discovery of peripheral aspects of Cities' alleged participation in the conspiracy, after having failed, despite already substantial discovery, to obtain any significant evidence of conspiracy for the period during which it was alleged to have directly injured him.

Plaintiffs are unable to show how any additional discovery could supply an inference of "conspiratorial" or causative conduct any stronger than that provided by the contracts themselves and the testimony in the affidavits and depositions already taken.

The court believes nothing new can be obtained by further discovery which will show causative conduct on the part of the teams, permitting recovery against them under § 4 of the Clayton Act.

### E. *Nishimura's and CSC's Claims*

█ Defendants have also moved to dismiss all claims asserted by plaintiffs Nishimura and CSC on the ground that they are only suing in their capacities as,

---

**19.** To the extent that this ex post facto affidavit contradicts or is inconsistent with the deposition, the court believes it should not be given sufficient weight to raise an issue, particularly in view of the other evidence. *See Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir. 1982).

**20.** It is recognized that demand is not necessary where it is futile, but such was not the case before the contracts were signed. *See Royster Drive-In Theatres v. American Broadcasting-Paramount Theatre, Inc.*, 268 F.2d 246, 251 (2d Cir.), *cert. denied*, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959); *accord, Cleary v. National Distillers & Chemical Corp.*, 505 F.2d 695 (9th Cir.1974).

respectively, stockholder/employee and stockholder of the two remaining corporate plaintiffs, HTVC and HEP. It is well settled that a stockholder who suffers loss due to injury to his corporation may not recover damages under the antitrust laws because his "injury as a stockholder [is] indirect, remote and consequential." *Associated General Contractors*, 459 U.S. at 533–34, 103 S.Ct. at 906–07; *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1119 (2d Cir.1975). Any injury to Nishimura as an employee of HTVC and HEP stands on the same footing. *Bichan v. Chemetron Corp.*, 681 F.2d 514 (7th Cir.1982); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 521 F.Supp. 1046 (S.D.N.Y.1981). The cases cited by plaintiffs, such as *Perkins v. Standard Oil Company of California*, 395 U.S. 642, 649–50, 89 S.Ct. 1871, 1875–76, 23 L.Ed.2d 599 (1969), are inapposite because here, unlike in *Perkins*, no injury other than that derived from stockholder or employee status is alleged. The defendants' motion must therefore be granted.

## V. *Conclusion*

Plaintiffs have had extensive discovery for eighteen months and have failed to show that its injury, the alleged loss of existing and prospective subscribers in Huntington, was proximately caused by any violation of the antitrust laws by any of the defendant teams. No question of material fact on the issues of the propriety of the demand upon the teams, the causal link between the teams' actions and plaintiffs' injuries, plaintiffs' standing to sue the teams, or the teams' participation in a conspiracy appears from the depositions and affidavits to support the allegations in the pleadings, although participation in a conspiracy would be insufficient in the absence of a causal link.

For the reasons set forth, summary judgment should be granted (i) dismissing Counts V–IX of the complaint in their entirety; (ii) dismissing Counts I–IV and XII of the complaint insofar as they claim that the sports team defendants conspired with Cablevision to deny plaintiffs "SportsChannel" programming, that the teams unlawfully refused to grant television production rights to plaintiffs, or that the teams acted wrongfully in granting such rights to Cablevision; and (iii) dismissing all claims asserted by plaintiffs Communications Systems Corporation and James Y. Nishimura. Because the sports teams are not defendants in any of plaintiffs' other claims, they should be dismissed from this action.

SO ORDERED.