Paul C. NORDBERG and Joseph P. Doherty, Plaintiffs,

v.

LORD, DAY & LORD, Peter L. Keane, Herbert Brownell, John Castles III, Reigh F. Klann, Frank B. Hall & Co., Inc., Estate of B. Lytton Johnston, Edwin Stephens, the American Manufacturers Mutual Insurance Co., Lumberman's Insurance Co., the Kemper Corp., John N. Blackman, Scarburgh Co., Inc., Charles L. Stewart, Windels, Marx, Davies & Ives, Dunnington, Bartholow & Miller, the Paul Revere Corp., Avco Corp., Clinton A. Reynolds, Bessemer Securities Corp., R. Daniel Saxe, Jr., Michael Lacher and Lacher, Spellman & Lesser, Defendants.

No. 84 Civ. 3045 (DNE).

United States District Court, S.D. New York.

Sept. 30, 1985.

Paul C. Nordberg, Auburn, Ma., and Joseph P. Doherty, pro se.

Fried, Frank, Harris, Shriver & Jacobson, New York City, Leon Silverman, of counsel, for defendants Lord, Day & Lord, Peter L. Keane, Herbert Brownell, John W. Castles, III, and Reigh F. Klann.

Windels, Marx, Davies & Ives, New York City, Charles L. Stewart, Raymond T. Munsell and Yvette Harmon, of counsel, for defendants Scarburgh Co., Inc., Windels, Marx, Davies & Ives and Charles Stewart.

Lacher, Spellun & Lesser, and Michael A. Lacher, New York City, pro se.

Rogers & Wells, New York City, James Maloney and Barbara Egan, of counsel, for defendants Bessemer Securities Corp. and R. Daniel Saxe, Jr.

Kissam, Halpin & Genovese, New York City, Michael F. Fitzgerald and James Halpin, of counsel, for defendant Frank B. Hall & Co., Inc.

Parker, Auspitz, Neesemann & Delehanty, P.C., New York City, Charles S. Barquist, of counsel, for defendants The Paul Revere Life Ins. Co., The Paul Revere Corp., AVCO Corp. and Clinton A. Reynolds.

Chadbourne, Parke, Whiteside & Wolff, New York City, William Bradner, Jr., of counsel, for defendant Dunnington Bartholow & Miller.

## OPINION AND ORDER

EDELSTEIN, District Judge.

Paul C. Nordberg and Joseph P. Doherty ("Plaintiffs"), shareholders in Scarburgh Co. ("Scarburgh"), commenced this civil RICO[1] action, *pro se*, against Scarburgh, its officers and directors, other major Scarburgh shareholders, several insurance companies, four law firms and a number of individual attorneys. Jurisdiction is predicated on 18 U.S.C. § 1964(a) and 1965 and this court's pendent jurisdiction. Defendants have moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the amended complaint for failure to state a claim upon which relief may be granted. Because the court finds that this complaint should have been brought as a derivative action, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, the complaint is dismissed.

## FACTUAL BACKGROUND

For the purpose of deciding the motions to dismiss, the facts as alleged in the amended complaint are taken as true.

From 1975 through 1979, plaintiffs purchased approximately twenty-two per cent of Scarburgh's outstanding stock. By the time plaintiffs acquired their stock, Scarburgh existed in name only, having ceased operations a decade earlier. Until late 1963, Scarburgh had operated as a commercial finance company, specializing in making loans against the collateral of agricultural commodities. In late November 1963, Scarburgh lost $24.5 million as a result of the famous "salad oil swindle," in which over $100 million worth of soybean oil was stolen from a public warehouse in Bayonne, New Jersey. The salad oil swindle has given rise to a number of criminal convictions, involving parties not connected with this lawsuit, and civil litigation entering its third decade.

In the Spring of 1963, Scarburgh instructed its insurance broker, defendant Frank B. Hall & Co. ("Hall"), to obtain insurance that would protect Scarburgh from loss of its commodities collateral.[2] Hall advised Scarburgh several weeks before the salad oil swindle that it had purchased such coverage from the American

1. "RICO" is the familiar abbreviation for the Racketeer Influenced and Corrupt Organizations Act.

2. The estate of B. Lytton Johnston ("Johnston") is also named as a defendant in this case. Johnston was Hall's President in 1963 and, according to plaintiffs, had primary responsibility for handling Scarburgh's insurance needs. Amended Complaint at ¶ 11. Defendant Edwin Stephens ("Stephens") is a retired Vice President of Hall. Plaintiffs allege that in 1963, Stephens advised Johnston on certain technical aspects of Scarburgh's insurance requirements. *Id.* at ¶ 12.

Manufacturers Mutual Insurance Co. ("AMNI") and that the policies were effective immediately. AMNI refused, however, to pay Scarburgh's claim for losses suffered during the salad oil swindle. As a result of the swindle, coupled with AMNI's refusal to pay, Scarburgh ceased operations as a commercial financing company. Scarburgh's only remaining assets were its claims against AMNI, for breach of the insurance contract, and Hall, for negligence and fraud in its failure to purchase the proper coverage.

Scarburgh retained defendant Lord, Day & Lord ("LDL"), which filed suit against AMNI in November 1965. LDL did not sue Hall, however, despite the fact that in AMNI's answer to the complaint, AMNI raised the affirmative defense that plaintiff's injuries were due to the negligence and/or fraud of Hall. According to plaintiffs herein, LDL "never so much as recommended that Scarburgh consider its remedies against Hall." LDL's posture in the litigation may be attributed to its alleged position of divided loyalties: from the time the action was commenced against AMNI in 1965 until 1979, LDL was general counsel to Hall.

LDL allegedly was beset by other conflicts. Defendant Herbert Brownell ("Brownell"), a partner at LDL, was a member of AMNI's Board of Directors until 1965, prior to the commencement of the action against AMNI, but almost two years after Scarburgh had filed its claim with AMNI for losses suffered during the salad oil swindle. Brownell had attended a number of meetings of AMNI's Board of Directors, during which Scarburgh's claims were discussed. In addition, during the negotiations between Hall and AMNI, another LDL partner, defendant Peter L. Keane ("Keane"), had been advising Hall as to the actual placement of Scarburgh's insurance coverage. Thus, at the time Scarburgh brought suit against AMNI in 1965, LDL, Scarburgh's counsel of record, had not only been a witness, but a participant, in the alleged breach of the insurance agreement. This was never disclosed to Scarburgh.[3]

Scarburgh's case did not come to trial until 1979, fourteen years after the complaint was filed. From 1975 through 1979, plaintiffs purchased shares in Scarburgh and immediately complained to Scarburgh management that the case was long overdue and should be brought to trial. Plaintiffs were repeatedly assured by Scarburgh's management, its general counsel, defendants Charles L. Stewart ("Stewart"), Windels, Marx, Davies & Ives ("WMDI") and Dunnington, Bartholow & Miller and its trial counsel, LDL, that the case was being prepared for trial. Scarburgh paid almost $2 million in legal fees to the above named attorneys. LDL did not, however, notice a deposition from 1967 until 1976. In November 1979, following a lengthy bench trial, Justice Richard Wallach dismissed Scarburgh's claims against AMNI in all respects.

Justice Wallach found that AMNI had "established its affirmative defenses of fraud and mistake by an overwhelming pre-

---

**3.** In addition to AMNI, plaintiffs have named other insurance companies as defendants. Plaintiffs name Lumberman's Mutual Insurance Company ("Lumberman's") and the Kemper Corporation ("Kemper"). According to plaintiffs, AMNI and Lumberman's are members of the "Kemper Group" of insurance companies. Amended Complaint at ¶¶ 13 & 14. Plaintiffs allege that "the 'Kemper Group' often funnels its business, its income and its expenses through Lumberman's under the terms of various internal re-insurance and expense sharing arrangements among and between the various 'Kemper Group' companies." *Id.* at ¶ 14. The Kemper Corporation "is a publicly owned company, affiliated with and substantially controlled by various insurance company members of the 'Kemper Group.'" *Id.* at ¶ 15.

Plaintiffs allege that LDL had maintained "a massive, continuing relationship between AMNI and its affiliates ..." *Id.* at ¶ 54. Plaintiffs in 1979 allegedly uncovered detailed records of substantial payments from AMNI and other Kemper Group insurance companies to LDL from 1963 through 1978. Plaintiffs infer from these payments that LDL "served as General Counsel to AMNI and its affiliates, in secrecy," during the time it was retained to prosecute Scarburgh's suit against AMNI. *Id.* Plaintiffs also allege that Brownell represented Kemper Group companies in other ventures. *Id.* at ¶ 55.

ponderance of credible evidence." Exhibit E to Affidavit of Yvette Harmon, at 20. Justice Wallach held that Scarburgh and/or Hall had a duty to disclose to AMNI the material fact that Scarburgh had business dealings with Anthony DiAngelos ("DiAngelos"), the principal thief in the salad oil swindle, Amended Complaint at ¶ 38, and the company he controlled, Allied Crude Vegetable Refining Corporation ("Allied"). Plaintiffs contend that LDL had documents in its files that would have countered this finding, but that LDL did not seek to introduce them at trial because of its ties to AMNI. For example, AMNI's underwriter, defendant John N. Blackman ("Blackman"), testified that: (1) he had never heard of DiAngelis or Allied prior to November 26, 1963, and (2) had he been informed of DiAngelis' and Allied's dealings with Scarburgh he would have declined Scarburgh's application for insurance. LDL allegedly possessed documentation reflecting Blackman's extensive independent dealings with DiAngelis and Allied prior to November 26, 1963.

Justice Wallach's opinion transformed Scarburgh's only asset in 1979 from a claim against AMNI for breach of insurance contract, to a claim against LDL for malpractice and fraud. In early 1980, after having discovered LDL's double dealing, plaintiffs disclosed this information to Scarburgh's management and urged it to discharge LDL and sue it for malpractice and fraud. Scarburgh's three member Board of Directors at the time was comprised of defendant Clinton A. Reynolds ("Reynolds"), Scarburgh's President,[4] defendant R. Daniel Saxe, Jr. ("Saxe")[5] and defendant Stewart, Scarburgh's general counsel and secretary. Scarburgh's management rejected these urgings and decided to retain LDL to prosecute an appeal of Justice Wallach's decision. The appeal was dismissed on December 24, 1980. Plaintiffs allege that LDL did not zealously prosecute the appeal and, in fact, ignored specific instructions from Scarburgh during the pendency of the appeal.

Having failed to secure LDL's discharge, Nordberg urged Scarburgh's management to reserve any rights it might have against LDL for any prior malpractice. However, the retainer agreement, dated June 10, 1980, contained no specific reservation of such rights. Plaintiffs allege that Scarburgh's management was not acting in the best interests of the corporation. Specifically, plaintiffs allege that Stewart was actively seeking employment at LDL from 1980 to 1982. He was thus in a conflict situation which he did not disclose to Scarburgh's shareholders. Plaintiffs further allege that from 1980 to 1982, Scarburgh's management dissipated well over $700,-000.00 in an effort to avoid pursuing LDL, Hall and AMNI directly for their collusion in burying Scarburgh's case against AMNI.

After Scarburgh repeatedly ignored plaintiffs' urgings that some direct action be taken against LDL, Nordberg filed a complaint of misconduct with the Departmental Disciplinary Committee, First Department ("Disciplinary Committee"). In August 1983, the Disciplinary Committee made multiple findings of professional misconduct against LDL, Keane, Brownell and Reigh Klann ("Klann"),[6] based on LDL's simultaneous representation of Scarburgh and AMNI, and its failure to advise Scarburgh of its potential causes of action

---

**4.** Reynolds is Vice President and a director of defendant The Paul Revere Life Insurance Company ("PRLI"). In addition, he is President of defendant Paul Revere Corporation ("PRCorp"), the parent company of PRLI. Defendant AVCO Corporation ("AVCO") allegedly owns both PRLI and PRCorp. Plaintiffs allege that PRLI, "directly and through affiliates, is the largest stockholder of Scarburgh, owning approximately 29% of Scarburgh's equity securities." Amended Complaint at ¶ 21.

**5.** Saxe is Secretary, General Counsel and Senior Vice President of defendant Bessemer Securities Corporation ("Bessemer"). Bessemer owns approximately 15 per cent of Scarburgh's outstanding equity securities. Amended Complaint at ¶ 25.

**6.** Klann is a partner at LDL. The amended complaint alleges that from 1963 until December 24, 1980 Klann was the LDL partner assigned to represent Scarburgh, in its suit against AMNI. Amended Complaint at ¶ 8.

against Hall. Amended Complaint at ¶ 92. The basis of these findings was the same information plaintiffs had brought to the attention of Scarburgh's management in early 1980. *Id.*

In early 1982, after Scarburgh had finally discharged LDL, Scarburgh moved before Justice Wallach to vacate the 1979 judgment on the ground that LDL's pervasive conflicts of interest constituted a fraud on the court, sufficient to warrant relief from judgment. At this time, plaintiffs' complaint with the disciplinary committee had been pending for approximately ten months. Plaintiffs allege that defendant John Castles III, one of LDL's partners, improperly mailed an *ex parte* letter to Justice Wallach, assuring the Justice that LDL had engaged in no professional misconduct during the litigation against AMNI. Plaintiffs allege that this mailing constituted an act of racketeering, i.e., mail fraud, and was made "in furtherance of the enterprise complained of herein." Amended Complaint at ¶ 96. Justice Wallach denied Scarburgh's motion on February 16, 1982.

On November 5, 1982, plaintiffs filed a derivative action, on behalf of themselves and all Scarburgh stockholders, against Scarburgh, LDL, Keane, Klann and Hall in New York State Supreme Court. Justice Edward Greenfield dismissed plaintiffs' derivative action on June 2, 1983. Justice Greenfield held that the corporation had the right and authority to direct litigation on its own behalf. He relied in part on Stewart's "represent[ation] to the court that Scarburgh is willing able and anxious to pursue its claims and will do so vigorously." Further, plaintiffs had failed to demonstrate to Justice Greenfield's satisfaction that they had made a demand on the corporation to sue or that there was an adequate basis for excusing the demand requirement. Justice Greenfield also stated in dicta that "should any director violate his fiduciary duties or exhibit bad faith or

misconduct in connection with Scarburgh's direct action, plaintiffs would then be able to bring an action on behalf of the corporation and against any such director after demand and refusal or a showing of a good excuse for not making such demand." Justice Greenfield's dismissal of plaintiffs' derivative action was affirmed on appeal. *Doherty v. Scarburgh,* 105 App.Div.2d 1169, 483 N.Y.S.2d 883 (1984).

After plaintiffs filed the derivative action, Scarburgh hired defendants Lachner, Spellman & Lesser (LSL) to attempt to obtain control of the action. LSL entered into a written agreement with Scarburgh that LSL would not assert any claims against any of Scarburgh's officers and/or directors.

In March 1984, plaintiffs moved before Justice Wallach, the justice who in 1979 dismissed Scarburgh's claims against AMNI, to vacate the dismissal on the ground of fraud. Plaintiffs allege herein that Scarburgh and its management actively opposed that motion. On May 15, 1984, Justice Wallach denied the motion. Justice Wallach noted that "Scarburgh has commenced and is prosecuting a malpractice action against LDL based in the main upon the same contentions now urged by [plaintiffs, Nordberg and Doherty]. Exhibit E to Affidavit of Michael A. Lacher, at 2. The court ruled that " '[i]f Scarburgh should prevail in subsequent litigation against LDL and establish its contentions of fraud and collusion, such a finding would then provide an appropriate basis for vacatur of this [the 1979] judgment.' " *Id.*[7] Justice Wallach also noted the "[e]ven more important" consideration that "these applicants [plaintiffs] themselves commenced a derivative stockholders' action against LDL, and that action has been dismissed on the ground that Scarburgh should control this litigation...." *Id.*

Plaintiffs thereupon walked next door to the federal courthouse and filed the instant RICO action. The amended complaint al-

---

**7.** Justice Wallach quoted his decision of February 16, 1982, Exhibit D to Affidavit of Michael A. Lacher, in which he denied Scarburgh's motion to vacate the 1979 judgment on the ground of fraud.

leges an enterprise that developed in two stages. The first stage was formulated in 1965 when the LDL defendants, AMNI, Hall and others conspired to deprive Scarburgh of the insurance coverage to which it was entitled. Defendants allegedly conducted the enterprise through a pattern of racketeering activity which, at this point, included "multiple" mail and wire fraud violations, misleading filings by Hall and Kemper with the Securities and Exchange Commission and misleading filings by AMNI and Lumberman's with individual state insurance departments. Amended Complaint at ¶ 101. This stage of the enterprise continued until 1979, when Scarburgh's suit against AMNI was dismissed by Justice Wallach. Plaintiffs allege that this stage of the enterprise damaged Scarburgh in the amount of $24 million and that plaintiffs "were proportionately damaged in their business and property by virtue of the damage to their holdings of $600,000.00 (total, principal amount) of Scarburgh's subordinated notes and approximately 22% (total) of Scarburgh's common stock." *Id.* Plaintiffs seek an injunction, pursuant to 18 U.S.C. § 1964(a), against the LDL defendants, AMNI and Hall, restraining them from engaging in "further activities with the effect of investing the gain(s) each has, to date, garnered from this pattern of racketeering activities, into legitimate business ventures." Amended Complaint at ¶ 103.

The second stage of the enterprise began after 1979, when Scarburgh's management, defendants Reynolds, Saxe and Stewart, joined the enterprise. Plaintiffs allege that after having been informed, no later than March 1980, of the wrongdoings of LDL, AMNI and Hall, Scarburgh's management conspired to cover-up this information. Scarburgh's management retained LDL for the appeal of Justice Wallach's 1979 ruling, paid LDL an additional $200,000.00 in legal fees and spent $700,000.00 of Scarburgh's funds to avoid any direct attack on LDL, AMNI or Hall. Scarburgh's management also hired defendants LSL and Lacher, who in turn, made false statements to plaintiffs and others with respect to the settlement negotiations with LDL. Plaintiffs allege

that they have been injured by reason of the second stage of the enterprise in the amount of $7,229,000.00. *Id.* at ¶ 102.

Plaintiffs have also asserted two state law claims. The first is against all defendants for common law fraud. Amended Complaint at ¶ 105. The second is asserted only against the LDL defendants for violations of Section 487 of the Judiciary Law of the State of New York. Amended Complaint at ¶ 107.

### DISCUSSION

Defendants contend that the amended complaint alleges only injury to the corporation, rather than to the plaintiffs, and thus this RICO action may only be brought by the corporation or by the shareholders through a derivative action. The court will first determine whether plaintiffs have alleged a corporate injury or an injury personal to them. Then, the court will decide whether the standing requirements for derivative actions apply to suits brought by shareholders under RICO.

*1. Does the Amended Complaint Allege Corporate Injury or Individualized Injury to Plaintiffs?*

The general rule is that "if the wrong is primarily against the corporation, the redress for it must be sought by the corporation," or by a shareholder through a derivative action. 12B W. Fletcher, Cyclopedia of the Law of Private Corporations § 5911, at 420–21 (Rev.Perm.Ed.1984) (hereinafter cited as Fletcher). "The action is derivative, that is, in the corporate right, if the gravaman of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Id.* at 421. Defendants are correct that the injury alleged in the amended complaint is injury plaintiffs have suffered derivatively through their ownership in Scarburgh. Hall's failure to insure, AMNI's refusal to honor Scarburgh's insurance claim, LDL's

various acts of malpractice in the conduct of the litigation, the failure of Scarburgh's director's diligently to pursue Scarburgh's claims against LDL, the waiver by Scarburgh's directors of rights against LDL, the complicity of various other law firms in the ·decision of Scarburgh's management not to pursue LDL; all of these alleged wrongs were perpetrated against Scarburgh. Plaintiffs suffered only by reason of their acquisition of Scarburgh stock in the mid-seventies.

■ Plaintiffs have not alleged any injury incurred other than from their status as shareholders in Scarburgh. At paragraph 101 of the Amended Complaint plaintiffs allege that they "were proportionately damaged in their business and property by virtue of the damage to their holdings [in Scarburgh]." It is well settled that "diminution in value of corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right...." *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981); *accord Cole v. Ford Motor Co.*, 566 F.Supp. 558, 569 (W.D.Pa.1983); *Weiner v. Winters*, 50 F.R.D. 306, 310 (S.D.N.Y. 1970). "It is only where the injury sustained to one's stock is peculiar to him alone, and does not fall alike upon other stockholders, that one can recover as an individual." 12B W. Fletcher, *supra*, § 5913, at 434. Any injury to plaintiffs' holdings in Scarburgh resulting from defendants' alleged wrongful conduct "fell alike" on Scarburgh's other shareholders.

■ An exception to the rule that shareholders may not sue for harm inflicted upon the corporation is where there exists "a special relationship between the suing shareholder and the defendant creating a special duty, contractual or otherwise, other than that owed to the corporation." *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir.1975). Plaintiffs contend that because of their extensive investigations, which have uncovered substantial evidence supporting Scarburgh's cause of action against LDL, evidence that plaintiffs have provided to Scarburgh's management, a special relationship exists between plaintiffs and the corporate defendants. Plain-

tiffs refer to the meeting of Scarburgh's shareholders held on October 23, 1983, during which defendants Saxe and Stewart allegedly stated that, out of any money obtained from Scarburgh's suit against LDL, an amount should be set aside as compensation to Nordberg for his investigative efforts. At the same meeting, defendant Lacher allegedly acknowledged that any progress it had made in its settlement negotiations with LDL was due to the plaintiffs' investigation and filings with the disciplinary committee. After the meeting, defendant WMDI, Scarburgh's general counsel, allegedly offered plaintiffs $750,-000.00 as payment for their efforts. Plaintiffs rejected this offer.

These facts, taken as true, do not establish a "special relationship," sufficient to allow plaintiffs' suit. All of plaintiffs' efforts were in their capacity as shareholders. Plaintiffs provided their investigative skills voluntarily, presumably to enhance Scarburgh's financial outlook, thereby benefitting themselves as shareholders. Scarburgh's management owed plaintiffs no greater duty than it owed other shareholders. Plaintiffs did not enter into an independent contract with Scarburgh's management to perform services. *Compare Waste Recovery Corp. v. Mahler*, 566 F.Supp. 1466, 1468 (S.D.N.Y.1983) (direct contractual relationship between plaintiffs/shareholders and defendants does not give plaintiffs standing to assert RICO claim). At best, plaintiffs allege that their efforts have benefitted Scarburgh. However, this benefit, by itself, does not give rise to any independent duty. Any cause of action plaintiffs may have for unjust enrichment is premature; Scarburgh will not be "enriched" by plaintiffs' investigative efforts until and if it recovers against LDL. Plaintiffs, therefore, have failed to allege injuries, other than those inflicted on the corporation, or a special relationship with defendants, entitling them to file an individual suit.

2. *Plaintiffs' Capacity to Bring RICO Action For Corporate Wrongs.*

■ Having determined that the injury alleged is a corporate injury, next issue is

whether the derivative action requirements of Rule 23.1 apply to shareholder suits brought under RICO. The common law rule is that "an action to redress injuries to a corporation cannot be maintained by the shareholder in his own name but must be brought in the name of the corporation. The shareholder's rights are only derivative and can only be asserted through the corporation." *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981). This common law rule has been extended to statutory causes of action enacted by Congress, such as the Sherman Act; "[a] stockholder may not bring an action in his own right for anti-trust violations causing corporate injury." *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1119 (2d Cir.1975); *accord Meyer Goldberg, Inc. of Lorain v. Goldberg*, 717 F.2d 290, 294 & n. 2 (6th Cir.1983); *Nishimura v. Dolan*, 599 F.Supp. 484, 500 (E.D.N.Y.1984); *see also Abramowitz v. Posner*, 672 F.2d 1025, 1031–32 (2d Cir. 1982) (policies underlying the Section 10(b) of the Securites Exchange Act of 1934 "are not offended by interpreting the business judgment rule to bar shareholder derivative litigation when a corporation's disinterested directors, independently and in good faith, determine that the action is not in the company's best interests."). Defendants contend that the same rule applies to actions brought under RICO.

The first step in the inquiry is to examine the language of the statute. 18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 ... may sue therefor in any appropriate United States district court ..." This language provides ammunition for plaintiffs' and defendants' herein, but gives little guidance to the court. Plaintiffs cite Congress' use of broad language, such as "any person," which indicates Congress' intent that shareholders may bring individual actions to redress RICO-type injuries inflicted on their corporation. Defendants contend that an injury inflicted on the corporation does not constitute an "injury to the business or property" of the shareholder. RICO's definition section, 18 U.S.C. § 1961, does not define "injury to business or property." Moreover, no other provision of RICO provides any guidance on this issue.

Although there is no direct authority in the Second Circuit, the unanimous view of courts in other circuits is that only the corporation may bring a RICO action to redress injury suffered by the corporation. *E.g., Warren v. Manufacturers Nat'l Bank of Detroit*, 759 F.2d 542, 544–46 (6th Cir.1985); *Gallagher v. Canon U.S.A., Inc.*, 588 F.Supp. 108, 110–11 (N.D.Ill.1984); *accord Club Assistance Program, Inc. v. Zukerman*, 594 F.Supp. 341, 348 n. 15 (N.D.Ill.1984); *see also Allison v. General Motors Corp.*, 604 F.Supp. 1106, 1120 (D.Del.1985) (nothing in RICO or its legislative history "indicating that the policy underlying RICO is inconsistent with director termination of derivative litigation."). The Sixth Circuit in *Warren, supra,* reasoned that " 'statutes are to be interpreted with reference to the common law and generally to be given their common law meaning absent some indication to the contrary.' " 759 F.2d at 545 (quoting *United States v. Monasterski Investment Co.*, 567 F.2d 677, 682 (6th Cir.1977) ).

This court agrees. RICO must be interpreted in this case with reference to state common law. Plaintiffs herein could not have claimed any injury until they acquired the status of shareholders in the mid-seventies. State common law bestowed upon plaintiffs their shareholder status, and as such, their right to invest in the legal fiction created by the state, Scarburgh. Plaintiffs initially took advantage of state law to acquire an interest in Scarburgh, and now seek to have the court contravene state law to enhance that interest. This, the court will not do. *See Gallagher v. Canon U.S.A., Inc., supra,* 588 F.Supp. at 111 n. 3 ("Once Canon has opted for the corporate structure of a subsidiary distributor, it should not be free to ignore the judicial consequences of that structure simply because the spirit moves it."). If Congress intended to abrogate the common law and create a cause of action for the individual shareholder it could have done so ex-

plicitly. Compare *Harmsen v. Smith*, 542 F.2d 496, 499–500 (9th Cir.1976) (Section 53 of National Bank Act of 1864 permits a shareholder to bring a direct action against directors of insolvent national bank after FDIC had been appointed as a receiver), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

The *Warren* and *Gallagher* decisions cited above were rendered before *Sedima, S.P.R.L. v. Imrex Co., Inc.*, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court's recent exhaustive decision on the scope of civil RICO. The holding in *Sedima*, however, is not inconsistent with the proposition that a shareholder must comply with the derivative action requirements of Rule 23.1 in order to redress corporate injury suffered "by reason of" a violation of 18 U.S.C. § 1962. In *Sedima*, the court interpreted Section 1964(c)'s phrase "by reason of a violation of" RICO's substantive provisions. 105 S.Ct. at 3277. The Court held that this language could not be limited by requiring the plaintiff to show either a "racketeering enterprise injury," or that defendant had already been convicted of one of RICO's predicate acts. *Sedima* dealt with the *type* of injury RICO redresses; at issue here is whether the corporation has the same right to control its RICO claims as it does its other causes of action. *See Warren v. Manufacturers Nat'l Bank of Detroit, supra*, 759 F.2d at 545. Unlike the lower courts in *Sedima*, this court is not superimposing artificial contraints on the express language of Section 1964(c). By adhering to the derivative action requirement, this court is merely applying tried and true principles of shareholder standing, which Congress evinced no intent to abrogate.

The Court in *Sedima* stated that RICO is to be read broadly:

> This is the lesson not only of Congress' self-consciously expansive language and overall approach, ... but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes,' ... The statute's 'remedial purposes' are nowhere more evident

than in the provision of a private action for those injured by racketeering activity.... Far from effectuating these purposes, the narrow readings offered by the dissenters and the court below would in effect eliminate § 1964(c) from the statute.

*Sedima, S.P.R.L. v. Imrex Co., Inc., supra*, 105 S.Ct. at 3286 (citations omitted). Derivative action requirements, however, are not inconsistent with the policies underlying RICO and Section 1964(c). *See Allison v. General Motors Corp.*, 604 F.Supp. 1106, 1120 (D.Del.1985) ("plaintiff has not pointed out nor has the Court been able to discover anything in the RICO statute or its legislative history· indicating that the policy underlying RICO is inconsistent with director termination of derivative litigation."). Section 1964(c) may still be used by shareholders as an effective tool against racketeers. The only qualification is that the corporation must decide in the first instance whether to employ that tool. *Cf. Abramowitz v. Posner, supra*, 672 F.2d at 1032 ("certainly, the decision whether to pursue such a claim [in the securities law context] is within the discretion of the private plaintiff."). If the corporation refuses to employ Section 1964(c) after a proper demand has been made, and that decision is not made in good faith because the corporation itself is run by racketeers, Rule 23.1 permits the shareholders to assert the corporation's claims derivatively.

Plaintiffs also argue that a recent Seventh Circuit opinion, *Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312, 316–17 (7th Cir.1985) dictates that this court should deny defendants' motion to dismiss. This argument is without merit. *Phillips* simply held that a state governmental unit had standing to bring a RICO suit against a retailer who filed fraudulent tax returns. *Phillips* does not, however, remove the requirement for a shareholder of a corporation to claim a direct RICO injury rather than only a derivative one.

### 3. *Consequences For Plaintiff's Failure to Bring a Derivative Action.*

Having determined that plaintiffs may only sue derivatively for the conduct al-

leged in the amended complaint, and therefore that the amended complaint must be dismissed, the court must decide whether plaintiffs should be provided the opportunity to file an amended complaint that complies with Rule 23.1.

### a. *Collateral Estoppel.*

Leave to amend may be denied where even an amended complaint will not state a cause of action against defendants. Scarburgh, the LDL defendants, and Hall—the defendants in plaintiffs' state court derivative action—contend that Justice Greenfield's dismissal of the derivative action should preclude plaintiffs' Rule 23.1 suit against them in Federal Court. 28 U.S.C. § 1738 provides: "The ... judicial proceedings of any Court of any such State ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State ... from which they are taken." In *Marrese v. American Academy of Orthopeadic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the Supreme Court held that "§ 1738 requires a federal court to look first to state preclusion law in determining the preclusive effect of a state court judgment." *Id.* at 1332. The Court noted that while "a state court will not have occasion to address the specific question whether a state judgment has issue or claim preclusive effect in a later action that can be brought only in federal courts[,] [n]evertheless, a federal court may rely in the first instance on state preclusion principles to determine the extent to which an earlier state judgment bars subsequent litigation." *Id.*

Because the federal courts have exclusive jurisdiction over RICO actions, plaintiffs could not have asserted their RICO claims in the state court action. Thus, under New York's law of *claim* preclusion or *res judicata,* plaintiffs' RICO action is not barred by the prior state court judgment. *Pauk v. Board of Trustees of City University of New York,* 119 Misc.2d 663, 464 N.Y.S.2d 953, 956 (N.Y.Sup.Ct.

1983). However, under New York's law of *issue* preclusion or collateral estoppel, the finding by Justice Greenfield that plaintiffs could not satisfy the requirements of a derivative action may preclude relitigation of that issue in federal court. "Under New York law 'the doctrine of collateral estoppel ... precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.'" *Murphy v. Gallagher,* 761 F.2d 878, 881 (2d Cir.1985) (quoting *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984)). New York law requires: (1) an "identity of the issue which has been necessarily decided in the prior action and is decisive of the present action and, ..." (2) a showing that the party sought to be precluded "had a full and fair opportunity to contest the decision now said to be controlling." *Id.* at 882 (quoting *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)). Based on this two-pronged test, plaintiffs are not precluded from relitigating the issue as to whether they've satisfied the derivative action requirements for suing defendants Scarburgh, Hall, Keene and Klann.

The issue before Justice Greenfield and that before this court are identical, i.e., whether there are circumstances which warrant depriving Scarburgh of its right to direct litigation on its own behalf. Justice Greenfield determined that plaintiffs had failed to make an adequate showing that a written demand had been made on the corporation. In addition, he found that because Scarburgh had represented that it intended to sue LDL, plaintiffs' derivative suit was premature. The same issues would be applicable in a derivative complaint filed in this court pursuant to Rule 23.1. *See generally Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1112, 1117–18 (D.Del.1985). Moreover, both the state court and this federal court are obliged to apply Delaware law, the state of

Scarburgh's incorporation. *Brooks v. Weiser,* 57 F.R.D. 491, 494 (S.D.N.Y.1972).

The second prong of the analysis requires the court to determine that plaintiffs had a full and fair opportunity to contest Justice Greenfield's decision. There are a number of factors involved in this analysis, including "the forum of the prior litigation, its extensiveness, the competence and experience of counsel, availability of new evidence, and indications of a compromise verdict." *Murphy v. Gallagher, supra,* 761 F.2d at 883. Based on these factors, this court cannot preclude plaintiffs from relitigating the issue of whether plaintiffs have satisfied the elements of a derivative action.

Although it is not entirely clear from the record before this court, it appears that plaintiffs proceeded *pro se* before Justice Greenfield. Under Rule 23.1, however, plaintiffs would be required to retain counsel to prosecute any shareholder derivative complaint filed in federal court. *Phillips v. Tobin,* 548 F.2d 408, 411–12 (2d Cir. 1976). Thus, "the competence and experience of counsel" appearing before Justice Greenfield is in doubt. *Compare Murphy v. Gallagher, supra,* 761 F.2d at 883 ("there is no suggestion that plaintiffs' counsel was not competent [in prior action] ...."). The fact that the rights of other shareholders may be irretrievably prejudiced cautions against giving preclusive effect to Justice Greenfield's decision where plaintiffs were not adequately represented by counsel.

Another factor weighing against preclusion is that there might be "new evidence

available that could alter the judgment reached." Justice Greenfield held that "nowhere in the record is there any evidence of any such demands" by plaintiffs on Scarburgh to sue LDL. Exhibit A to Affidavit of Michael A. Lacher, at 4. Moreover, he found that there was no basis for excusing the demand requirement because "plaintiffs have not named any [Scarburgh] director as a party-defendant in the derivative action and have not alleged any wrongdoing on their part." *Id.* at 5. In the amended complaint filed herein, however, plaintiffs have named Scarburgh's directors as defendants and have alleged wrongdoing on their part. Plaintiffs contend that they discovered the wrongdoing of Scarburgh's management after Justice Greenfield's decision. Based on the record before the court, there is no basis for precluding plaintiffs from relitigating the demand issue.[8]

### b. Other Considerations.

■ Although plaintiffs are not precluded from relitigating the derivative action issues, other considerations weigh against granting leave to amend, and in favor of, dismissing the amended complaint without prejudice. There does not appear to be an urgent need for disposition of plaintiffs' claims. Scarburgh has commenced suit against LDL for its conduct during the *Scarburgh v. AMNI* litigation. This fact may render plaintiffs' derivative complaint "premature" as a matter of law, because Scarburgh's recovery against LDL would redress the injury alleged herein.[9] In any event, plaintiffs will require time to find

---

8. Because this court has determined that the present record provides insufficient basis for finding that plaintiffs are collaterally estopped under New York law, the court does not reach the issue of whether Congress' concerns underlying the grant of exclusive jurisdiction for suits brought under RICO justify a finding of an implied repeal of the full faith and credit provisions of 28 U.S.C. § 1738. *See Marrese v. American Academy of Orthopaedic Surgeons, supra,* 105 S.Ct. at 1335; *see generally, Murphy v. Gallagher, supra,* 761 F.2d at 884–86.

9. Although this court has not given Justice Greenfield's decision collateral estoppel effect,

his decision involving nearly identical issues and facts is persuasive authority. Justice Greenfield found that plaintiffs' derivative action was premature "[i]nsofar as Charles L. Stewart has represented to the court that Scarburgh is willing, able and anxious to pursue its claims and will do so vigorously ...." Exhibit A to Affidavit of Michael A. Lacher at 5. Since that time, Scarburgh filed suit against LDL. Although plaintiffs contend that Scarburgh's suit against LDL is more or less a "sweetheart" action, it is too early for a fact-finder to make a reasoned determination.

adequate counsel to represent them in a derivative suit. Such counsel will need time to draft a derivative complaint that not only addresses the defendants' objections herein, but states a claim under RICO, a statute fraught with numerous pitfalls, even for the most experienced attorney. This case need not remain open during the interim. Accordingly, the amended complaint is dismissed without prejudice to plaintiffs' filing a new action that meets the requirements of Rule 23.1.[10]

## CONCLUSION

Defendants' motions to dismiss are granted. The amended complaint is dismissed, without prejudice to plaintiffs filing a new action, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

SO ORDERED.

---

**10.** Besides the deficiencies in plaintiffs' derivative allegations defendants have presented a number of other grounds for dismissal, such as failure to allege the elements of an enterprise, failure to allege a predicate offense, failure to allege a "pattern of racketeering" and failure to allege fraud with particularity. The court does not reach these issues.