**FEDERAL INSURANCE COMPANY, Plaintiff,**

v.

**CABLEVISION SYSTEMS DEVELOPMENT COMPANY, Charles F. Dolan, Communications Management Corp., Cablevision Systems Holdings Company, Atlantic Cable Television Service Corp., Cablevision of Huntington, Cablevision Systems Huntington Corp., Cablevision Program Services Company, Cablevision Systems Corporation, Cablevision Consolidations Company, Sports-Channel Associates, Long Island Cable Communications Development Company, AM Cable TV Industries, Inc., Lawrence Meli, Robert J. Sullivan, John Tatta, American Employers Insurance Company, Liberty Mutual Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pennsylvania and Mission Insurance Company, Defendants.**

**And Related Counter-Claims and Cross-Claims.**

**No. 85 CIV 250.**

United States District Court, E.D. New York.

July 1, 1986.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for defendant American Employers Ins. Co.; Herbert Dicker, Albert A. Foster, Jr., Ellen F. Weisman, of counsel.

Semel & Boeckmann, New York City, for Defendant Liberty Mut. Ins. Co.; Douglas A. Boeckmann, Elisa Schaefer Brickell, James F. Kelleher (admitted Pro Hac Vice), of counsel.

Simpson Thacher & Bartlett, New York City, for plaintiff Federal Ins. Co.; Barry R. Ostrager, Mary Kay Vyskocil, Gregory A. Ritter, of counsel.

Sullivan & Cromwell, New York City, for defendant Cablevision and individual defendants; Yvonne S. Quinn, Robert A. Sacks, of counsel.

BARTELS, District Judge.

This is a controversy among several insurance companies concerning coverage of their insured. Plaintiff Federal Insurance Company (Federal) brought this action under the Federal Declaratory Judgment Act, 29 U.S.C. § 2201, for a declaration of the rights and liabilities of the various insurance companies providing liability coverage to defendant Cablevision Systems Development Co., its affiliates and several officers and employees (collectively Cablevision), in connection with a law suit brought against Cablevision by one of its competitors, James Nishimura. Currently before the Court are motions for summary judgment brought by Federal and another of Cablevision's insurers, American Employers Insurance Co. (American), which seek, in effect, to determine the liability of a third insurer, Liberty Mutual Insurance Co. (Liberty), to contribute to the defense costs incurred by Cablevision in the underlying action. Liberty, in cross-motion for summary judgment on its claims, asserts that as a matter of law, its policy provides no coverage for any of the claims in the underlying complaint against its insured, and therefore it has no duty to defend. This claim is predicated on provisions in the Liberty policy limiting or excluding coverage where the insured acted knowingly or with intent to cause injury. The background of this action follows.

*Background*

A. *Nishimura Action*

The present action has its roots in an earlier suit filed January 11, 1983, against Cablevision by a small, competing cable

television company, Huntington TV Cable Corporation (HTVC), and several affiliates, controlled by James Nishimura which operated in Huntington, Long Island. *Nishimura, et al. v. Dolan, et al.*, 599 F.Supp. 484 (the *Nishimura* action). The bulk of the *Nishimura* complaint charged Cablevision with various violations of the federal antitrust laws, and also included pendant state antitrust and common law tort claims, the relevant portions of which are discussed below. In addition to the Cablevision defendants, the *Nishimura* complaint named as defendants several New York City area sports teams (Teams) [1] charging that exclusive cablecasting agreements between Cablevision and the Teams violated antitrust laws as well. Cablevision filed counterclaims against plaintiffs and the parties engaged in extensive discovery, involving disputes which, on several occasions, necessitated a series of hearings before this Court.

On October 19, 1984, some 18 months after the *Nishimura* suit was filed, the Court granted summary judgment dismissing all claims against the Teams on the ground, *inter alia*, that plaintiffs were without standing to challenge the exclusivity of the agreements between Cablevision and the Teams. *Nishimura v. Dolan*, 599 F.Supp. 484 (E.D.N.Y.1984). In the *Nishimura* action, there remain pending the federal antitrust and pendant state law claims against Cablevision alone. However, no further proceedings have occurred before this Court in the *Nishimura* action since the October 1984 decision. In the proceedings just described, Cablevision apparently has incurred in excess of $2,000,000 in legal expenses. The liability of Cablevision's various insurers for this sum, as well as possible future defense costs, is the subject of the declaratory action before this Court.

### B. *Present Action*

In January 1985, Federal filed the present declaratory action against Cablevision, its insured, and three other insurers who have provided coverage to Cablevision at various times—American, Liberty, and National Union Insurance Company of Pittsburgh, Pennsylvania (National Union) —to determine the various insurers' obligations, if any, to defend or indemnify Cablevision with respect to the claims asserted against it in the *Nishimura* action. Defendant Cablevision subsequently impleaded a fifth insurer, Mission Insurance Company (Mission), overlooked in the Federal Complaint, which had also provided potential liability coverage. Federal subsequently was granted permission to assert claims directly against Mission. Three of these insurers—Federal, American and Liberty— issued to Cablevision policies providing virtually identical coverage, although effective during different time periods. Liberty, whose policy is at issue in these motions, issued to Cablevision a policy of Comprehensive General and Broad Form Comprehensive General Liability insurance covering the period September 1, 1979 to September 1, 1980.[2]

Generally, the Comprehensive General Liability portion of the Liberty policy covers Cablevision for liabilities Cablevision incurs as a result of an "occurrence" during the policy period causing "bodily injury" or "property damage" as those terms are defined in the policy and subject to various exclusions discussed in more detail below. The Broad Form Comprehensive General Liability Endorsement provides further coverage to Cablevision for liabilities Cablevision incurs because of "personal injury" as defined in the policy, also subject to certain exclusions. Although the Broad Form Endorsement appears to provide Cablevision with coverage for "advertising injury" as well, a separate

**1.** Nishimura named as defendants the owners of the New York Islanders, the New Jersey Devils, the New Jersey Nets, the Mets and the Yankees.

**2.** Federal's policy covers the period September 1, 1982 through August 31, 1983, but its so-

called "second-tier" excess insurance policy, effective the same period, is irrelevant to the current motion. American's policy was effective September 1, 1980 through August 31, 1981.

"Amendatory Endorsement" explicitly excludes advertiser's liability from the policy. In addition to the indemnity coverage just described, Liberty's policy also obligates it to defend or reimburse defense costs of any action against Cablevision in which any claim is asserted that may be covered by Liberty's policy "even if any of the allegations of the suit are groundless, false or fraudulent." The policies issued by Federal and American are virtually identical to Liberty's except that unlike Liberty, they also provide coverage for advertising injury.[3]

Following commencement of the *Nishimura* action in January 1983, and after Cablevision had retained as its attorneys Sullivan & Cromwell to defend that action, Cablevision, through its insurance brokers, notified its insurers of the suit and provided them with copies of the *Nishimura* summons and complaint. American, by letter dated July 13, 1983, informed Cablevision of possible coverage under the American policy of a number of the claims in the *Nishimura* complaint concerning allegations of instigation of customer dissatisfaction, disparagement through false and misleading statements and interference with plaintiffs' relationship with customers, although the policy would not cover the antitrust claims. Therefore, American stated, "the company will defend the entire action and will indemnify the insured if it develops that the plaintiff offers proof of a covered claim not subject to any exclusions." (American Appendix [Amer.App.] Exh C). Similarly, Federal, by letter dated September 1, 1983, informed Cablevision that, while the bulk of the *Nishimura* complaint involved claims for which there was no coverage, it believed that the "allegations contained in [Counts 10, 11, 13–17] present issues as to whether coverage will be provided under the terms of the policy," and therefore Federal, "while standing ready to defend you in this litigation, agrees to allow your own attorneys to continue to defend you, at your own expense and we will contribute to the attorneys' fees generated by such defense." (Amer. App.Exh B). Liberty, however, has consistently denied coverage, despite several requests by Cablevision that it reconsider its decision in light of American's and Federal's decision to cover Cablevision. (Amer.App.Exh D; Federal App.Exh C).

Following the commencement of this action by Federal, all the other insurers cross-claimed against each other and against Cablevision, and counterclaimed against Federal, each denying its own liability under various theories and asserting the liability of Federal alone, or alternatively demanding apportionment of liability among all the insurers. In the motions now before the Court, American and Federal seek summary judgment on their claims against Liberty for a declaration that Liberty is liable to contribute to the costs of Cablevision's defense in the *Nishimura* action.[4] Liberty, in turn, seeks summary judgment on its claim for a declaration that it is not obligated to defend Cablevision or to contribute with the other insurers to Cablevision's defense costs, to which motion Cablevision has responded.

*Discussion*

The general principles of law governing an insurer's duty to defend are well known. Under New York law[5] an insur-

---

**3.** Not relevant to this motion are the policies of Mission and National Union which provide substantially different kinds of coverage and raise different issues concerning that coverage. Mission's policy, effective September 1, 1982 through August 31, 1983, is an "umbrella" liability policy which is excess to Federal's primary policy except in certain limited circumstances. National Union issued a "Directors and Officers" policy effective September 17, 1982 to September 17, 1985, covering Cablevision for certain claims made against officers, directors and partners of the various Cablevision entities.

**4.** American and Federal also seek a decision on the limits placed on their obligations to defend, if any, by Liberty's obligations. Upon this motion, the Court believes such consideration is premature and will not adjudicate this issue.

**5.** It is undisputed that New York law applies in this case. *See Liman v. American Steamship Owners Mutual Protection & Indemnity Assoc.,* 299 F.Supp. 106, 108 (S.D.N.Y.), *aff'd* 417 F.2d 627 (2d Cir.1969) (per curiam).

er's duty to defend, under a policy such as Liberty's, is broader than its duty to indemnify, *Goldberg v. Lumber Mutual Casualty Ins. Co.*, 297 N.Y. 148, 154, 77 N.E.2d 131 (1948), and is determined by comparing the allegations of the complaint with the terms of the policy in question. *See Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 424, 488 N.Y. S.2d 139, 142, 477 N.E.2d 441, 444 (1985). If the allegations of the complaint, liberally construed, arguably fall within a risk covered by the policy, then the insurer is required to defend regardless of how groundless, false or baseless the suit may be. *International Paper Co. v. Continental Casualty Co.*, 35 N.Y.2d 322, 325–326, 361 N.Y.S.2d 873, 875–876, 320 N.E.2d 619, 620–621 (1974). This is so even if the language of the complaint does not state all the facts requisite to establish coverage since "a policy protects against poorly or incompletely pleaded cases as well as those artfully drafted." *Ruder & Finn, Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 861, 422 N.E.2d 518, 521 (1981). Thus, the insurer is obliged to defend even though the complaint contains ambiguous or incomplete allegations and does not state facts sufficient to bring the case clearly within or without coverage, as long as there is potentially a case within the policy's coverage. *See American Home Assurance Co. v. Port Authority*, 66 A.D.2d 269, 278, 412 N.Y.S.2d 605, 610 (1st Dep't 1979); *Commercial Pipe & Supply Corp. v. Allstate Insurance Co.*, 36 A.D.2d 412, 415, 321 N.Y.S.2d 219, 221 (4th Dep't 1971), *aff'd*, 30 N.Y.2d 619, 331 N.Y. S.2d 42, 282 N.E.2d 128 (1972).

The insurer may be declared without obligation to defend "only if it could be concluded as a matter of law that there is no possible factual or legal basis on which [the insurer] might eventually be held to be obligated to indemnify [its insured] under any provision of the insurance policy", *Spoor-Lasher Co. v. Aetna Casualty & Surety Co.*, 39 N.Y.2d 875, 876, 386 N.Y.

S.2d 221, 222, 352 N.E.2d 139, 140 (1976), or the insurer can show that "the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *International Paper Co. v. Continental Casualty Co.*, 35 N.Y.2d at 325, 361 N.Y.S.2d at 875, 320 N.E.2d at 620 (1974). On the other hand, if the complaint against the insured asserts a single claim within the policy's coverage, the insurer must defend the entire action, even though the complaint asserts additional claims or alternative theories clearly falling outside the policy's coverage. *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 310, 486 N.Y. S.2d 873, 876, 476 N.E.2d 272, 275 (1984).

### A. The Liberty Insurance Policy

The only two aspects of Liberty's coverage arguably implicated by the *Nishimura* complaint are the coverage for injuries arising out of "property damage" and injuries arising out of "libel or slander or other defamatory or disparaging material" under Liberty's Personal Injury coverage.[6] In denying coverage, Liberty points out that its policy provides no coverage for property damage caused by the insured's intentional conduct, and excludes coverage for personal injury caused by disparaging statements which were made with knowledge of their falsity. Liberty asserts that the *Nishimura* complaint clearly alleges only knowing, intentional wrongdoing on the part of Cablevision and is not reasonably subject to any other construction.

The relevant provisions of Liberty's policy, which must be compared to the allegations of the *Nishimura* complaint, are as follows.

Under the Comprehensive General Liability portion of the policy, Liberty

> will pay on behalf of the insured [Cablevision] all sums which the insured shall

---

**6.** American and Federal also argue that certain claims come within Liberty's coverage for advertising liability. However, as noted, such coverage is excluded from Liberty's policy by an Amendatory Endorsement.

become legally obligated to pay as damages because of

Coverage A.  bodily injury or

Coverage B.  property damage

to which this policy applies, *caused by an occurrence*, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent .... [Emphasis added].

The term "occurrence" is defined as

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended* from the standpoint of the insured[.]  [Emphasis added].

"Property damage" is defined as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The Broad Form Comprehensive Liability Endorsement extends coverage to Cablevision for "personal injury" and "advertising injury" although, as noted above, advertising injury is excluded by a separate endorsement.  Under the Broad Form Endorsement, Liberty again commits itself "to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent."

"Personal injury" is defined to mean injury arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, imprisonment, or malicious prosecution;

(2) wrongful entry or eviction or other invasion of the right of private occupancy;

(3) a publication or utterance

(a) of a libel or slander or other defamatory or disparaging material, or

(b) in violation of an individual's right of privacy;  except publications or utterances in the course of or related to advertising, broadcasting, publishing or telecasting activities conducted by or on behalf of the named insured shall not be deemed personal injury.

The Endorsement does *not* require that such personal injury arise out of an "occurrence", that is from an accident "neither expected nor intended from the viewpoint of the insured."  However, the personal injury coverage in the Endorsement is subject to the following exclusions concerning the insured's knowledge and intent.  Under II(B) the insurance does not apply

(2) to personal injury ... arising out of the wilful violation of a *penal* statute or ordinance committed by or with the knowledge or consent of the insured;

.    .    .    .    .

(4) to personal injury ... arising out of libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, *made by or at the direction of the insured with knowledge of the falsity thereof.*  [Emphasis added].

Casting Liberty's argument in the terms of its policy, Liberty claims that the injuries alleged in the *Nishimura* complaint (1) are not covered as "property damage" since they are alleged to have been intended by Cablevision and thus do not arise from an "occurrence", and (2) are excluded from the definition of covered "personal injury" in the Endorsement because the injuries are alleged to have arisen out of the wilful violation of a penal statute, under exclusion II(B)(2), or to have arisen out of libel, slander or other disparaging or defamatory statements made "by or at the direction of the insured with knowledge of the falsity thereof," under exclusion II(B)(4).

## B. *The Nishimura Complaint*

These provisions of the Liberty policy must be compared to the allegations of the *Nishimura* complaint. This Court previously has noted that the 17 Count, 74 page *Nishimura* complaint "is prolific in its charges." *Nishimura v. Dolan*, 599 F.Supp. at 488. American and Federal, as indicated above, have denied coverage of any claim based on allegations of monopolizing or conspiracy to monopolize or restrain trade in violation of federal and state antitrust laws, and none of the parties contend here that Liberty covers these claims. They do contend, however, that the *Nishimura* complaint alleges, in ¶¶ 41–44 and Counts 13 through 16, damages to and interference with physical property, disparagement through false and misleading statements, and interference with business relationships which, when broadly read, "arguably fall within the coverage" of the Liberty policy's definitions of property damage and personal injury.

We turn now to the specific allegations which it is claimed are covered by Liberty's policy. Paragraphs 31–46 outline the conduct alleged by Nishimura as the basis for all his claims. All of the conduct in these preliminary paragraphs is alleged to be in furtherance of several conspiracies "the principal purpose and effect of which [are] to eliminate plaintiffs as defendants' competitors and to achieve for [defendants] a monopoly in the cable television business in the Town of Huntington." [¶ 36].

Beginning in ¶ 34, the complaint alleges that "in furtherance of the conspiracy and concert of action alleged below, [defendants] have agreed to commit and have committed extensive intentional sabotage of plaintiffs' physical plant while attaching defendants' cables and equipment to poles and subscribers' homes." Continuing in ¶ 42, Nishimura alleges a number of specific acts as "the means by which defendants have accomplished" a "Conspiracy Unlawfully to Obstruct Plaintiffs' Efforts to Attract and Retain Subscribers and to Operate its Business."[7] Such acts include intentional sabotage of plaintiffs' physical plant in order to obstruct plaintiffs' ability to compete, create customer dissatisfaction and induce subscribers to switch to Cablevision. Paragraph 42 further alleges predatory and unfair sales tactics, misrepresen-

---

7. Paragraph 42 alleges specifically,

(a) Defendants have caused defendant [subcontractor] AM to sabotage plaintiffs' physical plant (i.e., its cables, lines, and related equipment necessary for servicing its customers) by such wrongful means as intentionally destroying, damaging, and tampering with cables, lines and related equipment through which plaintiffs transmit television signals to subscribers, and by causing frequent system outages (i.e. power failure and resulting discontinuance of service to subscribers) through their acts of sabotage. ... [These acts] have seriously obstructed plaintiffs' ability to compete ... [by drawing] plaintiffs' resources away from ... normal operation[s]....

(b) Defendants have wrongfully engaged in and intentionally used their sabotage of plaintiffs' physical plant to create customer dissatisfaction with plaintiffs' services.

(c) Defendants have orchestrated their acts of sabotage with predatory and unfair sales tactics to intentionally deprive plaintiffs of their customers ... [by] intentionally disrupt[ing] plaintiffs' transmissions to subscribers ... [and then] induc[ing] [plaintiffs' subscribers to switch to Cablevision].

(d) Defendants ... have disparaged through false and misleading statements plaintiffs' character and reliability and the quality of plaintiffs' services .... Defendants' intent in causing such wrongful disparagement has been and will be to induce plaintiffs' present and potential customers to [switch to Cablevision].

(e) Defendants have caused AM and its employees to damage the property of plaintiffs' subscribers ... and then place the blame for same on plaintiffs ....

* * * * *

(g) Defendants ... have intentionally and wrongfully interfered with plaintiffs' relationship with ... customers by continuously making to subscribers misrepresentations regarding plaintiffs' financial, legal, and other status. Such misrepresentations have included and will include misrepresenting plaintiffs' financial status, misrepresenting the relationship between plaintiffs and defendant Cablevision Huntington, misrepresenting that defendant Cablevision Huntington and plaintiff HTVC are the same company, misrepresenting that plaintiffs are going out of business or have gone out of business, and misrepresenting that plaintiffs are losing lawfully granted franchise rights.

tations and disparagement through false and misleading statements in order to induce subscribers to switch to Cablevision and interference with plaintiffs' relationship with subscribers. In ¶ 44[8] the complaint alleges that

Also in furtherance of the conspiracy ..., defendants have on numerous occasions interfered with plaintiffs' contractual relationships with various suppliers of programming services. For example, defendants have contacted plaintiffs' suppliers with the sole intention of inducing same to discontinue dealing with plaintiffs; moreover, defendants have, when contacting plaintiffs' suppliers, disparaged plaintiffs and have thereby interfered with plaintiffs' business relationship with those suppliers.

The *Nishimura* complaint next alleges an additional "Conspiracy to Impose upon Plaintiffs Defendants' Pole Attachment Costs and to Interfere with Plaintiffs' Contractual Relationships with Utility Companies." Under this conspiracy, Nishimura alleges in ¶ 45 that Cablevision, "In order to accomplish the purposes" of that conspiracy, illegally attached their "lines and cables to utility poles (also occupied by plaintiff HTVC)" without approval of the utility company, managed to impose the costs therefor on plaintiffs, and "intentionally obstructed plaintiffs' efforts to minimize their pole attachment costs and harassed, intimidated, and pressured plaintiffs' employees performing work relating to pole attachments." Through this conduct, defendants "have also intentionally damaged plaintiffs' relationships with the ... utility companies." [¶ 46].

The allegations contained in ¶¶ 31–46, quoted above, are variously incorporated as the bases for Counts 13 through 17, which it is asserted should be covered by Liberty. In addition, those counts themselves contain specific allegations of conduct on the part of Cablevision in connection with the particular cause of action asserted in each

count. Thus, in Count 13, charging tortious interference with business relationships, the complaint alleges that "Defendants have on numerous occasions engaged in wrongful, malicious, and unlawful conduct in order to disrupt plaintiffs' existing and prospective service to customers" including sabotage, harassment and predatory sales tactics; "misrepresenting to plaintiffs' present and potential subscribers plaintiffs' financial, legal and other status; and disparaging plaintiffs ... through false and misleading statements .... The purpose and effect of these acts [was] wrongfully and maliciously to interfere with and cause alteration in plaintiffs' business relationships ...." [¶ 120]. The complaint goes on, in Count 13, to charge defendants with making "false and misleading statements" to plaintiffs' suppliers "disparaging plaintiffs" the "purpose and effect" of which was "wrongfully and maliciously to interfere with" plaintiffs' business relationship with those suppliers. [¶ 122].

Count 14, charging unfair competition and misappropriation, specifically alleges *"knowingly* false statements" [¶ 126 (emphasis added)], made by defendants to disparage plaintiffs' business, create customer confusion, intentionally misappropriate plaintiffs' property rights and unfairly compete. Count 15, claiming tortious interference with contractual relations, charges defendants with "causing, inducing and deceiving" customers, plaintiffs' principal lender, and suppliers "into not dealing with" plaintiffs [¶ 132], alleging specifically that "defendants have in each case had knowledge of such contracts", have "acted with the intention of interfering with those relations" [¶ 134], and "through their actions defendants have forced plaintiffs to spend considerable additional time and money to repair their business from damage intentionally caused by plaintiffs." [¶ 135].

---

**8.** The allegations of the intervening ¶ 43 clearly fall outside the effective dates of Liberty's policy and consequently are irrelevant.

In Count 16, charging trespass and conversion, plaintiffs assert that "through the conduct alleged [in ¶¶ 1–36 and 41–42], defendants have intentionally damaged or caused to be damaged plaintiffs' physical plant, with the aim of eliminating plaintiffs as competitors." [¶ 138]. Count 16 further charges that "When inducing plaintiffs' customers to cease dealing with plaintiffs, defendants have also on numerous occasions used or caused to be used plaintiffs' own drop lines and related equipment to hook up defendant Cablevision Huntington's cable to those customers who have been disconnected from plaintiffs' system. In doing so, defendants have intentionally interfered with or trespassed upon or converted unlawfully plaintiffs' property." [¶ 139].

Finally, Count 17 alleges a prima facie tort, asserting that the conduct outlined above was "done with the intention of injuring plaintiffs' business and eliminating plaintiffs as competitors." [¶ 144].

*Property Damage Coverage*

██ Although the *Nishimura* complaint obviously contains allegations of property damage, it should be clear from the recitation above that the complaint is one "patently bottomed" on allegations of intentional conduct in this regard. *American Home Assurance Co. v. Diamond Tours & Travel, Inc.*, 78 A.D.2d 801, 802, 433 N.Y. S.2d 116, 117 (1st Dep't 1980), *app. dismissed*, 52 N.Y.2d 1030, 438 N.Y.S.2d 303, 420 N.E.2d 101 (1981).

It is true that, in interpreting provisions similar to those contained in Liberty's policy, the New York courts have drawn a distinction between intentional causation of injury, which is not covered under such provisions, and intentional conduct causing unintended, although foreseeable injury, which is covered. *See McGroarty v. Great American Insurance Co.*, 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975). As another court summarized it, the courts have

distinguished between damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidently arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act (*Mary and Alice Ford Nursing Home Co. v. Fireman's Ins.*, 86 A.D.2d 736, 737–738 [446 N.Y. S.2d 599, 600–601 (3d Dep't)], *affd*, 57 N.Y.2d 656, [454 N.Y.S.2d 74, 439 N.E.2d 883 (1982)] ). Ordinary negligence does not constitute an intention to cause damage (*see Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 488, [426 N.Y.S.2d 603 (4th Dep't 1980)] ); neither does a calculated risk amount to an expectation of damage (*McGroarty v. Great American Ins. Co.*, [*supra* ] ).

*Continental Ins. Co. v. Colangione*, 107 A.D.2d 978, 979, 484 N.Y.S.2d 929, 930–931 (3d Dep't 1985); *see Public Service Mutual Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981) (insurer must cover dentist charged with sexual assault of patient where victim's complaint alleges injuries unintentionally caused by insured); *Mary and Alice Ford Nursing Home Co. v. Fireman's Ins.*, 86 A.D.2d 736, 446 N.Y.S.2d 599 (3d Dep't), *aff'd*, 57 N.Y.2d 656, 454 N.Y.S.2d 74, 439 N.E.2d 883 (1982)

On the other hand, where the allegations of a complaint are "patently bottomed" on allegations of intentional conduct which unambiguously fall outside the coverage of the policy, then the insurer is not obligated to defend. *See Shapiro v. Glens Falls Ins. Co.*, 39 N.Y.2d 204, 383 N.Y.S.2d 263, 347 N.E.2d 624 (1976); *American Home Assurance Co. v. Diamond Tours & Travel, Inc.*, 78 A.D.2d 801, 433 N.Y.S.2d 116 (1st Dep't 1980). In this case, a review of the individual allegations of property damage, as well as a review of the complaint *in toto*, reveals that the *Nishimura* plaintiffs consistently and relentlessly allege, in specific terms, that the Cablevision defendants acted not only intentionally, but with specific intent to cause the injuries alleged to have arisen from such property damage.[9]

---

**9.** Cablevision points in particular to ¶ 139 in Count 16, which alleges that defendants, by us-

Thus, in each case, Nishimura has alleged Cablevision's specific intent to cause the injuries resulting from Cablevision's acts of sabotage and damage to physical property, or else has characterized Cablevision's conduct as the means by which the Cablevision defendants sought to carry out the conspiracy to oust Nishimura from the cable television market, which necessarily entails an intent to cause the injuries resulting therefrom. *See St. Paul Ins. Companies v. Talladega Nursing Home, Inc.*, 606 F.2d 631, 634 n. 3 (5th Cir.1979) ("since the essence of the alleged conspiracy is a deliberate attempt to eliminate competition, it is doubtful that any liability could be imposed upon [defendant] for unintentional acts [requiring the insurer to defend]. Intent is 'almost essential' to a conspiracy count, *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279 [49 L.Ed. 518] ... (1904)").

Cablevision urges that, although the complaint is permeated with allegations of intentional conduct and injuries, the underlying facts alleged could be read to support a claim for damages based on unintended conduct or intended conduct producing unintended injury which would be covered by Liberty's policy. However, while the complaint might suggest that there may be facts giving rise to covered claims, such claims simply are not alleged in this complaint, and, under New York law, this Court may not recast the pleadings in order to find a claim covered by Liberty's policy. *Shapiro v. Glens Falls Ins. Co., supra; American Home Assur. Co. v. Diamond Tours & Travel, Inc., supra; Village of Newark v. Pepco Contractors, Inc.*, 99 A.D.2d 661, 472 N.Y.S.2d 66 (4th Dep't), *aff'd*, 62 N.Y.2d 772, 477 N.Y.S.2d 325, 465 N.E.2d 1261 (1984); *Trepacz v. General*

*Accident, Fire & Life Assur. Corp.*, 32 A.D.2d 736, 302 N.Y.S.2d 188 (4th Dep't 1969).

This Court recognizes that there is some authority to the contrary. As one commentator has stated the problem,

A more controversial situation arises when the complaint unambiguously alleges that the insured is guilty of behaviour that is not entitled to coverage, but the plaintiff would be entitled to relief even if the insured were guilty of some less heinous behaviour that would be entitled to coverage. The commonest example of this is when the complaint alleges that the insured is guilty of intentional wrongdoing, but the acts complained of could, if the pleadings were amended, also support a verdict of negligence. The preferable, though minority rule under those circumstances is that the insurer normally has a duty to defend even though the policy contains an exclusion for intentional wrongdoing.

Windt, *Insurance Claims and Disputes*, § 4.02 at p. 105. Cablevision has also cited a California case following the minority rule recommended by Windt in his treatise and urged against Liberty here. *CNA Cas. of Calif. v. Seaboard Sur. Co.*, 176 Cal. App.3d 598, 222 Cal.Rptr. 276 (1st Dist. 1986). In that case the California court, looking to the facts alleged in the complaint rather than the formal theory of liability or cause of action pleaded, held that the complaint, alleging intentional misappropriation, misrepresentation and malicious prosecution as part of a federal antitrust cause of action, created a "potential" for liability under the insurance policies, particularly in view of the liberal policy of amendment in federal court. Accordingly, the insurers were required to defend the action.

ing plaintiffs' "drop lines and related equipment to hook up defendant Cablevision Huntington's cable to those customers who have been disconnected from plaintiffs' system," thereby *"intentionally* interfered with or trespassed upon or converted unlawfully plaintiffs' property." [Emphasis added]. The Court, however, reads

the allegations of property damage in this count to allege an intent to cause injury, particularly in light of the characterization of defendants conduct, in ¶ 140, as "willful interference." Accordingly, this paragraph is insufficient to trigger coverage.

However, this Court is governed by New York law which does not subscribe to that theory. The rule in New York (and apparently in the majority of jurisdictions) is that an insurer is not required to defend where the complaint unambiguously alleges non-covered conduct on the part of the insured, even if the facts alleged would permit amendment or construction under a different theory which would be covered. Just such an attempt by a New York court to reinterpret or recast the complaint in order to create a covered claim was specifically rejected by the New York Appellate Division in *American Home Assurance Co. v. Diamond Tours & Travel, Inc.*, 78 A.D.2d 801, 433 N.Y.S.2d 116 (1st Dep't 1980), *rev'g*, 103 Misc.2d 733, 426 N.Y.S.2d 897 (Sup.Ct.N.Y.Cty.1979). In that case, clients of a travel agency sued the agency on charges of fraud, deception and intentional misrepresentation arising out of the failure of the agency to provide all services advertised as part of a charter tour. Although the agency's insurer refused to defend on the ground that it did not cover intentional, knowing conduct, the New York trial court, relying on liberal pleading rules, held that the underlying facts alleged gave the defendant sufficient notice of a possible claim for negligent misrepresentation, thereby requiring the insurer to defend. As that court erroneously stated,

So long as the complaint contains facts which constitute the material elements of a cause of action, the "theory of the pleadings," as originally alleged, will not defeat a claim based upon a different theory [citations omitted].

.      .      .      .      .

[A]lthough the complaint ... alleged that Diamond had deliberately, knowingly, willfully and maliciously misrepresented the nature of services provided in the tour package, the facts pleaded are sufficiently broad to support a judgment based upon a theory of negligent misrepresentation. [Citations omitted]. Thus, in spite of the allegations of intentional

acts, [the insurer] had notice that Diamond might be subject to judgment based upon a "negligent act, error or omission" within the scope of the policy. 103 Misc.2d at 737, 426 N.Y.S.2d at 900.

However, the reasoning of the trial court was rejected and the decision reversed by the Appellate Division which summarily found that

Clearly, the first and third causes [of action] ... sound in fraud, not negligence, and are not within the coverage of the policy. Further, the second cause of action ... alleging breach of contract is patently bottomed on allegations relating to Diamond's knowledge of the falsity of the representations it was making in the brochure. It is concluded that the alleged acts underlying the ... complaint do not sound in negligence and are willful, fraudulent acts within the exclusionary clause of the policy.

78 A.D.2d at 802, 433 N.Y.S.2d at 117–118. *See also, Village of Newark v. Pepco Contractors, Inc.*, 99 A.D.2d 661, 472 N.Y.S.2d 66 (4th Dep't 1984) (no duty to defend where complaint is essentially a contract action, not covered by policy, despite allegations of negligence); *Parkset Plumbing & Heating Corp. v. Reliance Ins. Co.*, 87 A.D.2d 646, 448 N.Y.S.2d 739 (2d Dep't 1982) (no duty to defend where complaint is clearly cast as a contract action, not covered by policy, although facts alleged could give rise to negligence claim); *Trepacz v. General Accident, Fire & Life Assurance Corp.*, 32 A.D.2d 736, 302 N.Y.S.2d 188 (4th Dep't 1969) (in assault case, insurer not required to defend under exclusion for intentional injury since "action is expressly and exclusively founded on intentional injury caused to Mrs. Cohen by plaintiff." *Id.*, 302 N.Y.S.2d at 189).

Those cases in which the court found a duty to defend despite allegations of intentional or other non-covered conduct are distinguishable in that the particular complaint also contained explicit allegations of negligence or other conduct covered by the

policy, *see, e.g., Schwamb v. Fireman's Ins. Co.,* 41 N.Y.2d 947, 394 N.Y.S.2d 632, 363 N.E.2d 356 (1977); *Nationwide Mutual Fire Ins. Co. v. Burke,* 90 A.D.2d 626, 456 N.Y.S.2d 223 (3d Dep't 1982); *American Home Assur. Co. v. Port Authority,* 66 A.D.2d 269, 412 N.Y.S.2d 605 (1st Dep't 1979); or was ambiguous or incomplete in its allegations, *see Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981); *International Paper Co. v. Continental Cas. Co.,* 35 N.Y.2d 322, 361 N.Y.S.2d 873, 320 N.E.2d 619 (1974); *Commercial Pipe & Supply Corp. v. Allstate Ins. Co.,* 36 A.D.2d 412, 321 N.Y.S.2d 219 (4th Dep't 1971), *aff'd,* 30 N.Y.2d 619, 331 N.Y.S.2d 42, 282 N.E.2d 128 (1972); or alleged intentional conduct producing unintended injuries, *see McGroarty v. Great American Ins. Co.,* 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975); *Continental Ins. Co. v. Colangione,* 107 A.D.2d 978, 484 N.Y.S.2d 929 (3d Dep't 1985); *State Farm Ins. Co. v. Trezza,* 121 Misc.2d 997, 469 N.Y.S.2d 1008 (Sup.Ct.Nassau Cty.1983).

The New York Court of Appeals decision in *Ruder & Finn, Inc. v. Seaboard Sur. Co., supra,* does not require a contrary conclusion. In that case, the underlying complaint charged that the insured, Ruder & Finn, a public relations firm, issued through a related company publicity adverse to aerosol products in an effort to compel the plaintiff, an aerosol products manufacturer, to retain Ruder & Finn to combat such publicity. Ruder & Finn's insurer, which provided coverage for "defamation" and "unfair competition", refused to defend on the ground, *inter alia,* that the complaint sounded predominantly in federal antitrust law. The New York Court of Appeals held that an allegation of false disparagement of plaintiff's products through defendant's adverse publicity, although made in the context of a cause of action couched in terms of restraint of trade, was sufficient to trigger the insurer's duty to defend. This was not a case, however, wherein the court sought to re-

cast an unambiguous pleading, as Cablevision and the other insurers seek to do here. As the Appellate Division characterized the complaint in *Ruder & Finn,*

> The "three count" complaint ... is rambling, overlapping, repetitive, vague and otherwise inartfully drafted. Upon its face, that complaint seems to touch upon requests for relief grounded in (i) antitrust violations under the Sherman Act, (ii) conspiracy, (iii) commercial extortion, (iv) tortious interference with contractual relations, and (v) false disparagement of products.

71 A.D.2d 216, 219, 422 N.Y.S.2d 85, 87 (1st Dep't 1979).

Accordingly, the Court of Appeals applied the well established rule that where the complaint is ambiguous, vague or inartfully drafted, the insurer must nevertheless defend if there is potentially a case within the policy's coverage. Although the complaint failed to allege the essential legal elements, the Court upheld the Appellate Division's finding of "a clear intent ... to hold [Ruder & Finn] accountable for product defamation." 71 A.D.2d at 221, 422 N.Y.S.2d at 88.

There are no such ambiguities in the instant case with regard to the claims being alleged nor to the allegations of intent to cause the injuries arising from the property damage alleged. *See Shapiro v. Glens Falls Ins. Co.,* 39 N.Y.2d 204, 383 N.Y.S.2d 263, 347 N.E.2d 624 (1976) (no duty to defend under libel, slander, defamation coverage under exclusion for intentional injuries where complaint alleges defendant spoke falsely, willfully and maliciously with intent to injure); *Albert J. Schiff Associates, Inc. v. Flack,* 73 A.D.2d 329, 425 N.Y.S.2d 612 (1st Dep't), *aff'd,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84 (1980) (no coverage under professional errors and omissions policy where complaint alleges only willfull and malicious conduct). Accordingly, the Court finds that the *Nishimura* complaint does not allege property damage arising out of an

"occurrence" as defined by the Liberty policy, and therefore does not trigger Liberty's duty to defend under that provision.

*Personal Injury Coverage*

■ Coverage of personal injury by Liberty is another story. The Liberty policy provides coverage for injuries arising out of "a libel or slander or other defamatory or disparaging material" without regard to the insured's intent, although it excludes coverage where such disparagement is made "with knowledge of the falsity thereof." Knowledge is the key word of the exclusion. It is undisputed that the *Nishimura* complaint contains repeated allegations of disparagement, through false and misleading statements concerning "plaintiffs' character and reliability and the quality of plaintiffs' services" [¶ 42(d) ], "misrepresentations regarding plaintiffs' financial, legal and other status" [¶ 42(g) ], and other statements which interfered with plaintiffs' relationships with subscribers [¶¶ 42(d), 42(g), 120, 127, 132], suppliers [¶¶ 44, 122, 128, 134], and principal lender [¶¶ 43, 121, 128, 133], constituted unfair competition [¶ 126], misappropriated plaintiffs' property, reputation and good will [¶ 127], or generally caused "direct injury." [¶ 128].[10]

Here the complaint must be scrutinized to ascertain whether knowledge of falsity was alleged in all instances. Although the complaint consistently alleges that all disparaging statements were false, only once, in connection with Count 14, alleging unfair competition and misappropriation, does it allege disparagement through *"knowingly* false statements." [¶ 126 (emphasis

added) ]. Count 14, in ¶ 125, incorporates by reference the predicate allegations of disparagement in ¶¶ 42(d), 42(g) and 44, thereby apparently clothing those predicate allegations with the same knowledge of falsity alleged in ¶ 126. However, Count 14 goes on, in ¶¶ 127 and 128, to allege additional disparaging statements without alleging they were made with knowledge of their falsity. Thus, ¶ 127 alleges that "Defendants have also unfairly competed ... by falsely representing to present and potential subscribers of plaintiffs that plaintiffs' cable system is going out of business" and have thereby created customer confusion, intentionally misappropriated plaintiffs' property rights, interfered with contractual relations and misappropriated and traded on plaintiffs' reputation and good will. Similarly, ¶ 128 alleges that "defendants have also, through their disparagement of plaintiffs to plaintiffs' principal lender and suppliers of programming services, caused plaintiffs direct injury." Although arguably it is not impossible to find that the allegations of knowledge of falsity set forth in ¶ 126 also clothe the disparagement alleged in ¶¶ 127 and 128 with knowledge, there is an ambiguity created which the law requires to be resolved in favor of the insured. *See Klein v. Salama,* 545 F.Supp. 175, 177 (E.D.N.Y.1982); *American Home Assur. Co. v. Port Authority,* 66 A.D.2d 269, 278, 412 N.Y.S.2d 605, 610 (1st Dep't 1979).

■ However, when we come to Count 13, there is no such ambiguity. Count 13 alleges, *inter alia,* that defendants misrepresented to subscribers "plaintiffs' finan-

---

10. The complaint variously alleges "misrepresentations" and "disparagement" on the part of defendants which demeaned plaintiffs' financial and legal status and the "character and reliability and the quality of plaintiffs' services," which appear to constitute both defamation and disparagement. As stated by the New York Court of Appeals, the gravaman of defamation and disparagement, both of which are covered by Liberty's policy, "are falsehoods published to third parties." The Court continued,

Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed. Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement [where] malice and special damages are proven [citations omitted].

*Ruder & Finn, Inc. v. Seaboard Surety Co.,* 52 N.Y.2d 663, 670–671, 439 N.Y.S.2d 858, 862, 422 N.E.2d 518, 522 (1981).

cial, legal and other status; and disparag[ed] plaintiffs, including plaintiff Nishimura, through false and misleading statements made to plaintiffs' present and potential customers." [¶ 120]. It further alleges, in ¶ 122, that "plaintiffs also are informed and believe that defendants have made false and misleading statements to one or more of [plaintiffs'] suppliers disparaging plaintiffs." Nowhere is it alleged in Count 13 that these statements were knowingly false. It is true that ¶ 118 also incorporates into Count 13 the predicate allegations of disparagement in ¶¶ 41–46. However, unlike ¶ 126 in Count 14, there is no general statement applicable throughout Count 13 that such disparagement was made through knowingly false statements. Furthermore, while the allegations of tortious conduct in Counts 13 and 14 overlap, each count specifically alleges a different cause of action with different injuries; in Count 13, tortious interference with plaintiffs' relationships with customers, suppliers and principal lender, and in Count 14, unfair competition and misappropriation of plaintiffs' property rights, reputation and good will. Under the circumstances, the Court could not reasonably conclude that the allegation of knowledge of falsity in ¶ 126 applies also to the proceeding allegations in Count 13 and that the complaint is "subject to no other interpretation."

■ Nor can the Court accept Liberty's contention that defendants' knowledge of the falsity of the alleged disparaging statements is necessarily inferred from other allegations that such disparagement was made "wrongfully" and with intent to cause some of the injuries alleged. Disparaging statements obviously may be made wrongfully and with intent to harm the reputation of another, see Ruder & Finn, Inc. v. Seaboard Sur. Co., 52 N.Y.2d at 670–671, 439 N.Y.S.2d at 861–862, yet without any actual knowledge that such statements are false. See Restatement 2d Torts, § 580B (1977).

■ Liberty also argues that public policy bars insurance coverage for intentionally caused injuries and thus relieves it of liability. This argument is unnecessary with regard to Liberty's coverage for property damage since the policy itself excludes such coverage. The pertinent provisions of the complaint alleging personal injury arising from disparagement have already been discussed. Although some of the allegations specifically allege intentional injury, others in relation to disparagement can easily be construed as alleging unintentional injury.[11] As such they are not barred by any public policy. Consequently, the Court believes it is unnecessary to reach the public policy issue. However, assuming, as Liberty contends, that only intended injury is alleged, the question of public policy becomes relevant.

Speaking of the provisions of an insurance policy which barred coverage of intentional injuries, Justice Cardozo said, "Even if its terms did not so limit it, the fundamental principle that no one shall be permitted to take advantage of his own wrong would import the limitation." Messersmith v. American Fidelity Co., 232 N.Y. 161, 165, 133 N.E. 432 (1921). From this Liberty argues that public policy in New York bars insurance coverage for any injuries alleged to have been intentionally caused by the insured.

Liberty relies on two cases, Public Service Mutual Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981), and Messersmith v. American Fidelity Co., supra, both of which involved an insured who was sued in a civil action for injuries arising out of the violation of a penal statute. In Goldfarb the insured was a dentist convicted of sexually assaulting a patient who then filed a civil suit against him, and in Messersmith the insured was a car owner who illegally permitted a minor to drive a car involved in an accident. The question addressed in those

11. For example, see ¶¶ 127 and 128, neither of which alleges a specific intent to cause the particular injury asserted to have been caused by defendants' disparagement.

cases was whether public policy barred the insured from receiving the protection of his insurance policy when sued for injuries caused by the violation of a statute. In answer to this question, the Court of Appeals distinguished between intended and unintended injuries and held that public policy bars coverage of intentionally caused injuries arising in those cases from the insured's violation of a penal statute, but that such public policy did not bar coverage for those injuries which were not specifically intended by the insured. In accordance with these decisions, there are a number of New York cases which clearly establish a public policy barring insurance coverage for the intended consequences of the insured's violation of penal statutes. *See Morgan v. Greater N.Y. Taxpayers Mutual Ins. Assn.*, 305 N.Y. 243, 112 N.E.2d 273 (1953); *Baldinger v. Consolidated Mutual Ins. Co.*, 15 A.D.2d 526, 222 N.Y.S.2d 736 (2d Dep't 1961), *aff'd*, 11 N.Y.2d 1026, 230 N.Y.S.2d 25, 183 N.E.2d 908 (1962); *Nassau Ins. Co. v. Mel Jo-Jo Cab Corp.*, 102 Misc.2d 455, 423 N.Y.S.2d 813 (Sup.Ct.), *aff'd*, 78 A.D.2d 549, 432 N.Y.S.2d 29 (2d Dep't 1980); *Utica Mutual Ins. Co. v. Cherry*, 38 N.Y.2d 735, 381 N.Y.S.2d 40, 343 N.E.2d 758 (1975).

The further question remains, however, whether coverage of an intentional injury resulting from the violation of tort law but not a violation of penal law is barred by public policy. Liberty argues that the public policy announced in *Messersmith* and *Goldfarb* is applicable whenever the insured is alleged to have intended a particular injury even though such injury does not arise from the violation of a penal statute. Upon this issue the Court has found no New York authority directly on point and Liberty cites none. New York law therefore appears to be unsettled in this area. There are, of course, numerous cases holding that an insurer is not required to cover intentionally inflicted injuries; but they have so held solely on the ground that the particular insurance policy excluded intentional injury (usually under an "occur-

rence" requirement similar to Liberty's), *not* that such coverage is barred by public policy. *See, e.g., McGroarty v. Great American Ins. Co.*, 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (1975) (citing *Messersmith* without mention of public policy); *Continental Ins. Co. v. Colangione*, 107 A.D.2d 978, 484 N.Y.S.2d 929 (3d Dep't 1985); *State Farm Ins. Co. v. Trezza*, 121 Misc.2d 997, 469 N.Y.S.2d 1008 (Sup.Ct. 1983). On the other hand, there are cases which have permitted such coverage under the terms of a policy without mentioning the existence of a public policy barring the same.

For instance, the Court in *Ruder & Finn, Inc. v. Seaboard Sur. Co., supra,* (previously cited on another point) permitted such coverage without indicating that it might be barred by New York public policy. As in the *Nishimura* complaint, the complaint in *Ruder & Finn* alleged intentional harm through disparagement of plaintiff's products as part of a conspiracy to restrain plaintiff's trade. *See* 71 A.D.2d 248, 422 N.Y.S.2d 85 (1st Dep't 1979). Despite the repeated allegations of a conspiracy intentionally to harm plaintiff, the Court found that the single allegation of product disparagement made in the context of that conspiracy was sufficient to require the insurer to defend under the policy's "defamation" coverage. No mention was made of the possibility that public policy could bar coverage. *See also Levinson v. Aetna Cas. & Sur. Co.*, 42 A.D.2d 811, 346 N.Y.S.2d 428 (3d Dep't 1973).

In view of these authorities, and in the absence of any case directly to the contrary, the Court concludes that while New York's public policy does bar coverage of intended injuries arising from the violation of a penal statute, there is no indication that it prevents coverage where, as here, the violation of a penal statute is not involved. Under the "exceedingly broad" duty to defend imposed by New York law, *Colon v. Aetna Life & Cas. Ins. Co.*, 66 N.Y.2d 6, 8, 494 N.Y.S.2d 688, 689, 484

N.E.2d 1040, 1041 (1985), and the expansive reading which must be given the complaint, the Court cannot find that the allegations "cast that pleading solely and entirely within the policy exclusion[ ]" requiring knowledge of falsity. *International Paper Co. v. Continental Cas. Co., supra.* Rather, the Court finds that the complaint, insofar as it alleges injuries arising from disparaging statements without clearly alleging defendants' knowledge of the falsity thereof, asserts a claim potentially within the coverage of Liberty's policy, and is not barred by public policy.[12]

*Conclusion*

For the reasons above, the Court finds that (1) the *Nishimura* complaint does not allege property damage arising out of an "occurrence", as defined in the Liberty policy, and accordingly Liberty is not required to defend the *Nishimura* action under such coverage, and (2) the complaint alleges injuries arising out of disparagement which come within the Liberty policy coverage for personal injury. Accordingly, under the terms of its policy, Liberty is obliged to provide a defense to its insured Cablevision or to reimburse it for the costs of such defense. The Court does not decide at this time the extent to which such liability for defense costs must be prorated among Cablevision's various insurers, if at all. To the extent provided in this opinion, the motions for summary judgment by Federal and American are granted, and that of Liberty is denied.

SO ORDERED.

---

**12.** Cablevision argues that even if the complaint did allege disparagement with knowledge of falsity, the underlying facts could support a claim for disparagement without such knowledge, again relying on the decision of the California court in *CNA Cas. of Calif. v. Seaboard Sur. Co., supra.* The Court rejects this theory for the same reasons it rejects Cablevision's assertions that the Court may ignore clear allegations of intent to cause injury with regard to Liberty's coverage of property damage.